[No. A096854. First Dist., Div. Three. Apr. 6, 2004.]

THE PEOPLE, Plaintiff and Respondent, v.
THOMAS FRANKLIN WHEELOCK, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

\*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts 1, 2, 3, 5, 6, 7, and 8.

## COUNSEL

Randy Baker, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General; Robert R. Anderson, Chief Assistant Attorney General; Gerald A. Engler, Assistant Attorney General; Catherine A. Rivlin and Christina Vom Saal, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**PARRILLI, J.**—A jury convicted Thomas Franklin Wheelock of first degree murder with personal use of a firearm, and with the special circumstance that the murder was committed during a robbery. The jury rejected a special circumstance allegation that the murder was committed while Wheelock was lying in wait. After a penalty trial, the jury chose a sentence of life without the possibility of parole. The court imposed that sentence, and stayed a four-year term for the firearm use. Wheelock raises a series of claims on appeal. There was no reversible error, and therefore we affirm.

### BACKGROUND

On November 24, 1997, Armored Transport, Inc. informed the Oakland police that one of its armored trucks was missing. Wheelock and Rod Cortez were the employees who had been on duty in that truck. The next day, the

truck was found behind an auto parts store in San Ramon. Cortez's body was in the truck; he had been shot three times in the right side of the head and neck.

On November 27, a Utah highway patrol officer stopped Wheelock as he drove a Ford Bronco without a rear license plate, which was a violation of Utah law. Wheelock gave the officer his driver's license and a bill of sale for the Bronco. A computer check revealed a warrant for Wheelock's arrest. As he took him into custody, the officer asked Wheelock if he knew why he was being held at gunpoint. Wheelock replied "because I robbed my work." The officer asked if he had hurt anyone, and Wheelock said "yeah, I did." Wheelock nodded his head when asked if he had shot "him." The officer asked what happened, and Wheelock said "I just flipped out. I was going to lose my job soon and I just—." Wheelock stopped responding at that point.

That night, Wheelock was interviewed by Oakland police officers in a Utah jail. He was cooperative, and did not deny the shooting. Parts of the interview were taped, but no details of this interrogation were entered into evidence.

The next day, Wheelock gave another interview in the Utah jail to an Alameda County prosecutor. A tape of this interrogation was played for the jury. Wheelock waived his *Miranda* rights and gave the following account. He had returned from a Caribbean cruise with his friend Peter York the day before the shooting. Just before the cruise, Wheelock learned the state had denied his application for a card authorizing him to be a security guard. This meant he would not be able to continue working for Armored Transport. He started thinking about robbing an armored car and going to Canada to "try to start over." On the second or third day of the cruise, he began making notes on his plan. Shooting his partner in the armored car was always a part of the plan.

Wheelock's goal was to try to become an assassin after the robbery. He had considered doing the robbery on the Wednesday before Thanksgiving, but was concerned he might be sent home when he reported on Monday of that week because of the problem with the guard card. He had lunch with York before going to work on Monday, and told him he was "going to do it." Wheelock asked York to leave a backpack with a change of clothes and an extra gun by the side of York's house. York complied with this request.

Wheelock planned to commit the robbery as he and Cortez were on the way to Union Bank, but could not bring himself to do it then. Wheelock failed to correctly account for some bags of checks at Union Bank, which threw them off schedule. Wheelock said Cortez was "a little upset with me." They were due at Brinks by 7:30, but showed up "very late." The Brinks

employees were angry, and Wheelock apologized. Cortez "got real mad at me for apologizing because we're supposed to just blame it on something else and not on ourselves."

Wheelock said the fact he had "screwed up" that day made him worry that his job would be further jeopardized. When they loaded up the money at Brinks, he "just flipped." Cortez was driving the truck as they pulled away from Brinks at around 8:00. Cortez told Wheelock again that he shouldn't have apologized, and said Wheelock was going to have to "figure out the paperwork." Wheelock drew his gun and shot Cortez three times. He thought the second shot missed. The truck was "barely moving," and Wheelock managed to push Cortez away from the wheel and get himself into the driver's seat.

Wheelock drove the truck to San Ramon and parked it in an out-of-the way place behind the parts store. He was covered with blood when he got out, and washed himself at a faucet behind the store. He ran to York's house, three or four blocks away. He took the backpack York had left for him, as well as a duffel bag he found in York's garage, and returned to the truck. Wheelock loaded the money into the duffel bag, but found it too heavy to carry. He put some money in the backpack, left the duffel bag in some bushes, and returned to York's house. There he left some money for York, as he had promised to do.

Wheelock then walked to a restaurant and called a taxi. After an abortive attempt to take a train to Portland, he took another taxi to Walnut Creek, where he found York in a video arcade. York worked at the arcade but was off duty. He agreed to drive Wheelock to Sacramento. First they went back to San Ramon and picked up the duffel bag with the money. York then took Wheelock to a motel in Sacramento. The next morning, Wheelock bought the Bronco at a used car lot. When he returned to the motel, he saw a police car and decided not to get the money he had left in his room. He got on the freeway with the money he had with him, around $28,000.

Wheelock took Interstate 5 north through Redding, then turned east because he wanted to stay off major highways. After getting lost, and spending a sleepless night in Idaho, he decided he "didn't want to do it anymore." He had always wanted to see Colorado, so he was on his way there, intending ultimately to return to California, when he was arrested.

We will discuss further facts as they are relevant to Wheelock's contentions on appeal.

## DISCUSSION

1.–3.\*

· · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · ·

4. *The Motion to Suppress the Utah Statement*

Wheelock moved to suppress the statement he made at the Utah jail where he was held pending extradition to California. His principal argument was that, because he was represented by Utah counsel for purposes of the extradition proceedings, the prosecutor's questioning in the absence of Wheelock's attorney violated his Sixth Amendment right to counsel under *Massiah v. United States* (1964) 377 U.S. 201 [12 L.Ed.2d 246, 84 S.Ct. 1199] (*Massiah*). The court denied the motion, ruling that since Wheelock had not yet been charged, his Sixth Amendment right to counsel had not attached and thus there was no *Massiah* violation.

On appeal, Wheelock acknowledges that "a person's Sixth and Fourteenth Amendment right to counsel attaches only at or after the time that adversary judicial proceedings have been initiated against him." (*United States v. Gouveia* (1984) 467 U.S. 180, 187 [81 L.Ed.2d 146, 104 S.Ct. 2292]; see also *Texas v. Cobb* (2001) 532 U.S. 162, 172 [149 L.Ed.2d 321, 121 S.Ct. 1335] ["the Sixth Amendment right to counsel attaches only to charged offenses"]; *Fellers v. United States* (2004) 540 U.S. 519 [157 L.Ed.2d 1016, 124 S.Ct. 1019, 1022].) However, Wheelock notes that state law determines when a prosecution commences for purposes of the Sixth Amendment right to counsel. (*Moore v. Illinois* (1977) 434 U.S. 220, 228 [54 L.Ed.2d 424, 98 S.Ct. 458].) He claims that under Penal Code section 804, subdivision (d), his right to counsel attached upon the issuance of an arrest warrant.[5] He also contends the right to counsel attaches at the commencement of extradition proceedings under California law. Neither of these arguments is sound.

By its terms, Penal Code section 804 governs commencement of prosecution "for purposes of this chapter [chapter 2, title 3, part 2 of the Penal Code]." It was drafted with the statutes of limitation in mind. (See Cal. Law Rev. Com. com., 50 West's Ann. Pen. Code, (2004 supp.) § 804, pp. 56–57; *People v. Le* (2000) 82 Cal.App.4th 1352, 1357–1358 [98 Cal.Rptr.2d 874].)

---

\*See footnote, *ante*, page 796.

[5] Penal Code, section 804, subdivision (d) states: "For the purpose of this chapter, prosecution for an offense is commenced when any of the following occurs: [¶] . . . [¶] (d) An arrest warrant or bench warrant is issued, provided the warrant names or describes the defendant with the same degree of particularity required for an indictment, information, or complaint."

To determine when Sixth Amendment rights attach, the California Supreme Court follows the holdings of the United States Supreme Court. (E.g., *People v. Martinez* (2000) 22 Cal.4th 750, 758–765 [94 Cal.Rptr.2d 381, 996 P.2d 32] [right to speedy trial]; *People v. Slayton* (2001) 26 Cal.4th 1076, 1081–1083 [112 Cal.Rptr.2d 561, 32 P.3d 1073] [right to counsel]; *People v. Clair* (1992) 2 Cal.4th 629, 657 [7 Cal.Rptr.2d 564, 828 P.2d 705] [right to counsel.) In *United States v. Gouveia, supra,* 467 U.S. 180, the high court made it clear that the Sixth Amendment right to counsel does not attach at the time of arrest: "Our speedy trial cases hold that that Sixth Amendment right may attach before an indictment and as early as the time of 'arrest and holding to answer a criminal charge,' [citations], but we have never held that the right to counsel attaches at the time of arrest. This difference is readily explainable, given the fact that the speedy trial right and the right to counsel protect different interests. While the right to counsel exists to protect the accused during trial-type confrontations with the prosecutor, the speedy trial right exists primarily to protect an individual's liberty interest . . . ." (*Gouveia, supra,* at p. 190.)[6]

As further explained in *Moran v. Burbine* (1986) 475 U.S. 412, 430 [89 L.Ed.2d 410, 106 S.Ct. 1135]: "The Sixth Amendment's intended function is not to wrap a protective cloak around the attorney-client relationship for its own sake any more than it is to protect a suspect from the consequences of his own candor. Its purpose, rather, is to assure that in any 'criminal prosecutio[n],' U.S. Const., Amend. 6, the accused shall not be left to his own devices in facing the ' " 'prosecutorial forces of organized society.' " ' [Citations]. By its very terms, it becomes applicable only when the government's role shifts from investigation to accusation. For it is only then that the assistance of one versed in the 'intricacies . . . of law,' *ibid.,* is needed to assure that the prosecution's case encounters 'the crucible of meaningful adversarial testing.' [Citation.]"

■ Here, the prosecution was still in the investigatory stage when Wheelock was questioned. "For an interrogation, no more or less than for any other 'critical' pretrial event, the possibility that the encounter may have important consequences at trial, standing alone, is insufficient to trigger the Sixth

---

[6] Wheelock suggests *People v. Webb* (1993) 6 Cal.4th 494, 527 [24 Cal.Rptr.2d 779, 862 P.2d 779] supports the view that the Sixth Amendment right to counsel may attach at the time of arrest. Not so. Webb was already in custody on unrelated charges when information was elicited from him. The court's statement that his Sixth Amendment rights had not attached because "he was not arrested on capital charges until the day after" his statements were taped was directed toward the charges, not the "arrest." This is clear from the *Webb* court's citation of *Gouveia, supra,* 467 U.S. 180, and its reliance on the rule that the Sixth Amendment right to counsel "attaches only to those offenses for which adversary criminal proceedings have begun." (*Webb, supra,* at pp. 527 and 528, quoting *McNeil v. Wisconsin* (1991) 501 U.S. 171, 175 [115 L.Ed.2d 158, 111 S.Ct. 2204].)

Amendment right to counsel. As *Gouveia* made clear, until such time as the ' " 'government has committed itself to prosecute, and . . . the adverse positions of government and defendant have solidified' " ' the Sixth Amendment right to counsel does not attach. [Citations.]" (*Moran v. Burbine, supra,* 475 U.S at p. 432.) Thus, a defendant's right to the presence of an attorney during interrogation arises only "after the first formal charging proceeding." (*Id.* at p. 428.)

To support his alternate claim that the right to counsel under the Sixth Amendment arose with the commencement of extradition proceedings, Wheelock cites *People v. Boyd* (1978) 86 Cal.App.3d 54 [150 Cal.Rptr. 34] (disapproved on another point in *People v. Clair, supra,* 2 Cal.4th at p. 658), and *People v. Booker* (1977) 69 Cal.App.3d 654 [138 Cal.Rptr. 347]. These cases do not help him.

Booker was questioned by California police officers in a New Mexico jail, where he was under arrest for a robbery in New Mexico. (*People v. Booker, supra,* 69 Cal.App.3d at p. 660.) After stating the rule that *Massiah* applies only after "adversary proceedings have commenced," the court observed: "[I]n this case, however, no adversary proceedings had commenced against defendant concerning the crime about which he was being interrogated. No arrest warrant had issued on the murder charges and no extradition proceedings were underway." (*People v. Booker, supra,* 69 Cal.App.3d at p. 663.) However, the court's reference to an arrest warrant and extradition proceedings was merely descriptive of the early stage of the investigation. The holding of *Booker* conforms to the usual rule: "No charges had been filed against appellant regarding [the California crimes], nor had counsel been appoint to defend him regarding them. Accordingly although counsel had been appointed on the New Mexico charges, the interrogations investigating the California crimes were permissible." (*Id.* at p. 664.) The *Boyd* case merely recites the context of the *Booker* holding. (*People v. Boyd, supra,* 86 Cal.App.3d at pp. 60–61.)

There is no case law from the United States Supreme Court or any California state court on whether extradition proceedings might be considered "adversary judicial proceedings" at which the Sixth Amendment right to counsel attaches. The question has been settled in the federal Circuit Courts of Appeals, however. (E.g., *United States v. Yousef* (2nd Cir. 2003) 327 F.3d 56, 142, fn. 66 [extradition proceedings are not criminal proceedings, but civil proceedings related to criminal proceedings in another jurisdiction, and thus do not trigger any Sixth Amendment protections]; *DeSilva v. DiLeonardi* (7th Cir. 1999) 181 F.3d 865, 868–869 ["the Sixth Amendment does not apply to extradition"]; *Chewning v. Rogerson* (8th Cir. 1994) 29 F.3d 418, 420 ["It is well settled that extradition proceedings are not considered

criminal proceedings that carry the Sixth Amendment guarantee of assistance of counsel"]; *Judd v. Vose* (1st Cir. 1987) 813 F.2d 494, 497 [extradition hearing has modest function not involving guilt or innocence, and is not criminal proceeding within meaning of Sixth Amendment].)

Wheelock relies on *Roper v. State* (1989) 258 Ga. 847 [375 S.E.2d 600], in which the Georgia Supreme Court held that interrogation of a suspect who had requested appointed counsel, and was represented by counsel at an extradition hearing, violated "the rule of *Edwards v. Arizona* 451 U.S. 477 [68 L.Ed.2d 378, 101 S.Ct. 1880] [] (1981) and *Michigan v. Jackson* 475 U.S. 625 [89 L.Ed.2d 631, 106 S.Ct. 1404] [] (1986)." (*Roper v. State, supra,* 375 S.E.2d at p. 601.) However, we believe the *Roper* court misconstrued the holdings of *Edwards* and *Jackson. Edwards* was not a Sixth Amendment case. (*Edwards v. Arizona, supra,* 451 U.S. at p. 480, fn. 7.) It involved the propriety of interrogating a suspect after he has invoked his right to counsel during questioning, under *Miranda* and the Fifth and Fourteenth Amendments. (*Edwards,* at p. 482.) Neither Roper nor Wheelock asserted their right to counsel during questioning. (*Roper v. State, supra,* 375 S.E.2d at p. 602.) *Jackson* involved the right to counsel during postarraignment custodial interrogation. (*Michigan v. Jackson, supra,* 475 U.S. at p. 629.) The court noted that the arraignment "signal[led] 'the initiation of adversary judicial proceedings' and thus the attachment of the Sixth Amendment." (*Ibid.*) Neither Roper nor Wheelock was charged or arraigned before the interrogations in question. (*Roper v. State, supra,* 375 S.E.2d at pp. 601–602.)

We note also that the *Roper* court assumed custodial interrogation was a "critical stage" of the proceedings for purposes of determining the right to counsel. (*Roper v. State, supra,* 375 S.E.2d at p. 603.) The United States Supreme Court has made it clear that such an assumption is unwarranted in the Sixth Amendment context. (*Moran v. Burbine, supra,* 475 U.S at p. 432 [interrogation alone is insufficient to trigger Sixth Amendment right to counsel; government must have committed itself to prosecute].) We find *Roper* unpersuasive.[7]

---

[7] Wheelock also relies on *United States v. Harrison* (9th Cir. 2000) 213 F.3d 1206, for the proposition that the existence of an "ongoing relationship with counsel concerning the offense about which the defendant was interrogated" establishes a Sixth Amendment right to counsel. *Harrison* cannot be read so broadly. The court framed its holding thus: "[I]n limited and well-defined circumstances, a defendant's ongoing representation by an attorney, although that representation began before indictment, invokes the right to counsel once that right attaches at the time of indictment." (*Harrison,* at p. 1207.) Wheelock is in no position to take advantage of this rule. He was not under indictment, and it is difficult to characterize his relationship with Utah counsel as "ongoing" for purposes of a "pending criminal investigation," in the absence of any indication the relationship was expected to continue beyond the extradition proceedings. (*Id.* at p. 1213.)

■ We agree with the approach taken by the federal Courts of Appeals. The commencement of extradition proceedings is not enough, by itself, for the Sixth Amendment right to counsel to attach. Any other rule would be inconsistent with the United States Supreme Court's recognition that, before the formal instigation of charges, the investigative functions of the police should not be "unnecessarily frustrate[d]" by overprotective application of the Sixth Amendment. (*Maine v. Moulton* (1985) 474 U.S. 159, 179–180 [88 L.Ed.2d 481, 106 S.Ct. 477] [investigative powers are limited by Sixth Amendment only as to pending charges]; accord, *Texas v. Cobb, supra,* 532 U.S. at pp. 170–171; see also, e.g., *McNeil v. Wisconsin, supra,* 501 U.S. at p. 181 [admissions of guilt after valid *Miranda* waivers serve compelling interest in solving and punishing crime]; accord, *Texas v. Cobb, supra,* 532 U.S. at p. 172.)[8] The trial court properly denied Wheelock's motion to suppress the statements he made in the Utah jail.

5.–8.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

The judgment is affirmed.

McGuiness, P. J., and Corrigan, J., concurred.

A petition for a rehearing was denied April 30, 2004, and appellant's petition for review by the Supreme Court was denied June 30, 2004. Kennard, J., was of the opinion that the petition should be granted.

---

[8] We emphasize, as did the *Cobb* court, that restricting the right to counsel under the Sixth Amendment before the filing of charges does not diminish a suspect's "rights against compulsory self-incrimination and to consult with an attorney before authorities may conduct custodial interrogation." (*Texas v. Cobb, supra,* 532 U.S. at p. 171.) Wheelock does not contest the validity of his *Miranda* waiver.

*See footnote, *ante,* page 796.