[No. G030494. Fourth Dist., Div. Three. July 21, 2004.]

THE PEOPLE, Plaintiff and Respondent, v.
MICHAEL WOODS, Defendant and Appellant.

### COUNSEL

Law Offices of Dennis A. Fischer, Dennis A. Fischer and John M. Bishop for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Meagan J. Beale and Susan Elizabeth Miller, Deputy Attorneys General, for Plaintiff and Respondent.

### OPINION

**BEDSWORTH, Acting P. J.**—Michael Woods was convicted of special circumstances murder for instigating the shooting death of his business partner Horace McKenna. As the prosecutor explained in his opening statement, this "case spans about 20 years and involves hundreds of people." The jury heard from a good many of those people at trial. However, it did not hear from John Sheridan, the man who killed McKenna. Woods contends the prosecution unlawfully interfered with his right to call Sheridan as a witness. He also contends the police infringed upon his right to counsel by using an informant to elicit incriminating statements from him. We recognize the fact the prosecution's actions in this case forced Woods to detour his defense, and put on a different—possibly less convincing—case than he wanted. But we find no misconduct on the part of the prosecution and, equally important, find no diminution of Wood's Fifth or Sixth Amendment rights which rose to the level of constitutional error.

* * *

Shortly after midnight on March 9, 1989, McKenna was gunned downed by machine gun fire as he returned to his Carbon Canyon home in the back of a limousine. It is undisputed Sheridan was the shooter. The only question for the jury was whether Woods instigated the hit.

Woods and McKenna met while working as California Highway Patrol officers. Upon leaving the highway patrol, they went into the strip club business. That was 1977. By 1980, they had three clubs and business was good. However, not all was well between them. McKenna was a huge, intimidating man who witnesses said liked to "live large" and "throw his weight around." And according to people in the clubs, he often imposed himself on Woods and made life difficult for him. At one point, Woods asked a bouncer if he would kill McKenna for $30,000. When the bouncer declined— and then revealed the offer to others—Woods gave him his walking papers.

In the early 1980's, Woods hired David Amos to work in the clubs. Over time, it became apparent to Amos that Woods and McKenna did not get along. And because Amos was friendly with Woods, he was *persona non grata* with McKenna. This worried Amos because he considered McKenna to be very dangerous.

So did Woods. And in 1988, his fear of McKenna gathered more gravitas when McKenna threatened to have his daughters raped. Woods told Amos about the threat and asked him if he would help him kill McKenna. Amos said he would. Sometime later, Woods was overheard to say he was going to kill McKenna.

Actually, though, Amos ended up hiring Sheridan for the job. Woods had allotted $50,000 for the hit, but Amos only gave Sheridan about half of that. According to Amos, Woods had no contact with Sheridan, and Sheridan did not know Woods was behind the scheme. In fact, Amos told Sheridan he wanted McKenna killed for his own protection. Following the murder, Amos became Woods's new partner. However, their relationship soured when Amos came to suspect Woods was embezzling money from the clubs. Amos threatened legal action and tried to obtain greater control over the clubs by making business deals without Woods's knowledge.

It took the police nearly a decade to piece the case together. Eventually, Sheridan confessed to the shooting and worked with authorities to implicate Amos. Investigators then used Amos to get Woods. In exchange for leniency, Amos agreed to meet with Woods and wear a wire so the police could listen to their conversation.

The meeting was held at a Los Angeles deli. To get Woods talking about the murder, Amos told him Sheridan was pestering him for money. Woods advised Amos not to give him any, because it would look like an admission. Amos then told Woods that Sheridan suspected he was behind the murder. This took Woods by surprise, but he was confident the police would not be able to prove his involvement. He was confident the police were only on to him for tax evasion and did not "have shit on the other thing." Toward the end of the conversation, he asked Amos what ever happened to the murder weapon, and Amos assured him Sheridan had thrown it away.

As Woods was leaving the deli, the police placed him under arrest. He was charged with murder for financial gain and by means of lying in wait. The jury convicted him of murder for financial gain, but the court struck the special circumstance and sentenced him to prison for 25 years to life.

## I

Woods contends the prosecutor committed prejudicial misconduct by interfering with his right to call Sheridan as a witness. The record does not bear this out.

The prosecutor originally designated Sheridan as a witness. However, after the jury was sworn, the prosecutor announced he did not intend to call Sheridan after all. This caused the defense great consternation. Claiming Sheridan was the "linchpin" to its case, the defense sought to call Sheridan as its own witness. However, Sheridan's attorney said he would advise Sheridan to invoke his Fifth Amendment right against self-incrimination because his plea agreement with the prosecution had yet to be consummated.

Under the agreement, the prosecution would dismiss the charge of capital murder in exchange for Sheridan's guilty plea to manslaughter and other allegations carrying a 20-year sentence. The prosecutor informed the court the agreement was brought about by Sheridan's willingness to work with authorities and was contingent on his continued cooperation, meaning he would have to testify truthfully if called by the prosecution. The prosecutor made no bones about the fact he was not going to execute the agreement until Woods's trial was over. Sheridan's attorney made it equally clear Sheridan would not testify for Woods until Sheridan was sentenced. Believing this presented a potential due process problem, the court invited briefing from the parties and set the matter for a hearing.

The defense papers did not mince words: "In its strategic effort to make Sheridan unavailable as a witness, the prosecutor provided Sheridan and his counsel with a written proposed plea agreement, but has delayed execution of

that agreement until after Mr. Woods's trial . . . thereby technically allowing for the assertion of the Fifth Amendment under just the circumstances that have arisen here. What is implicit in this arrangement is that the prosecution has made Sheridan's deal contingent upon his not being available to the defense. This is nothing short of misconduct on the part of the prosecution."

The defense proposed an assortment of remedies to address the situation. First, it asked the court to dismiss the case, declare a mistrial, or exclude Amos's testimony. Then it suggested various means to secure Sheridan's testimony, such as granting him judicial immunity or continuing Woods's trial until Sheridan was sentenced. The defense also argued Sheridan had waived his Fifth Amendment rights by accepting the plea bargain and agreeing to testify for the prosecution.

The court held a lengthy hearing on the matter. Although it did not expressly impugn the prosecutor's motives, it did recognize Sheridan's availability "is, to a certain extent, controlled by the People because the People have pending a deal" with him. The court said it would take "an idiot" not to see that "in order for [Sheridan] to protect himself, he's got to do what will maintain this deal with the prosecution. Which is, if the prosecution is not calling [him], just sit there and shut up."

While the court believed the prosecution was at least partly responsible for Sheridan's decision to take the Fifth, it did not believe this warranted dismissing the case, declaring a mistrial, or excluding Amos's testimony. Nor did it believe a continuance would solve anything, given the prosecutor's refusal go forward with Sheridan's plea agreement prior to the completion of Woods's trial. The court did believe there was a "pretty good case" for granting Sheridan judicial immunity, but in the end it rejected this option as unprecedented.

The court then discussed the prospect of allowing the defense to introduce Sheridan's statements through other witnesses. To accommodate Woods's due process rights, the court said it would be willing to relax the hearsay rule and afford the defense wide latitude as far as admitting Sheridan's statements into evidence. It also promised to instruct the jury Sheridan's out-of-court statements could be considered for their substantive truth.

When asked about this approach, the defense admitted it would be able to get all of Sheridan's statements into evidence through other witnesses. However, it insisted this would not be a suitable substitute for examining Sheridan on the witness stand. The court rejected this position, saying, "It is not necessarily a constitutional violation for a defendant not to be able to present their case in the way that they would like to present it, as opposed to

getting the substance of the evidence in." Believing the defense could get the substance of Sheridan's statements into evidence through other witnesses, the court ruled Sheridan's unavailability did not amount to a violation of Woods's constitutional rights.

At trial, the defense was given free rein in terms of admitting Sheridan's statements into evidence. It used his statements to impeach Amos's version of events and show Amos and Sheridan had the most to gain from McKenna's demise. It also used his statements to prove Sheridan and Amos hated Woods so much they would be willing to falsely implicate him in McKenna's murder. And, as promised, the court instructed the jury it could consider Sheridan's statements for their substantive truth.

Despite all this, Woods argues his conviction must be reversed because he was not permitted to call Sheridan to the witness stand. While he does not challenge the trial court's decision on the immunity issue, he does challenge the trial court's decision on the prosecutorial misconduct issue. In his view, the prosecutor's actions distorted the factfinding process to such a degree they undermined his right to present a defense. We do not agree.

"The state and federal Constitutions guarantee the defendant a meaningful opportunity to present a defense. [Citations.] As [our Supreme Court has] observed, 'A defendant's constitutional rights to compel the attendance of witnesses, as guaranteed by the Sixth Amendment, and to due process, as guaranteed by the Fourteenth Amendment, are violated when the prosecution interferes with the defendant's right to present witnesses.' [Citations]." (*People v. Lucas* (1995) 12 Cal.4th 415, 456 [48 Cal.Rptr.2d 525, 907 P.2d 373].)

■ To establish a violation of his compulsory process rights, a defendant "must establish three elements. 'First, he must demonstrate prosecutorial misconduct, i.e., conduct that was "entirely unnecessary to the proper performance of the prosecutor's duties and was of such a nature as to transform a defense witness willing to testify into one unwilling to testify." ' [Citation.] Second, he must establish the prosecutor's misconduct was a substantial cause in depriving the defendant of the witness's testimony. [Citation.] . . . Finally, the defendant must show the testimony he was unable to present was material to his defense. [Citation.]" (*People v. Lucas, supra*, 12 Cal.4th at p. 457.)

■ Taking these elements out of order, it is clear the prosecutor's actions were a substantial cause in keeping Sheridan off the stand. The Attorney General argues Sheridan's attorney was actually the moving force behind Sheridan's decision not to testify, but while Sheridan's attorney did counsel

him to take the Fifth, this advice was precipitated by the prosecutor's decision not to call Sheridan as his own witness. The prosecutor had that prerogative, of course. However, he also said he was going to put off Sheridan's sentencing until Woods's trial was over. As the trial court noted, this left Sheridan with little choice other than to "just sit there and shut up," rather than testify for the defense and risk losing his plea agreement, which enabled him to avoid prosecution for capital murder. Under these circumstances, the requisite link between the prosecutor's conduct and Sheridan's refusal to testify was sufficiently established. (See *In re Martin* (1987) 44 Cal.3d 1, 31 [241 Cal.Rptr. 263, 744 P.2d 374] [substantial cause requirement is satisfied when prosecutor's actions carry "significant coercive force" and are "soon followed by the witness's refusal to testify"].)

■ Less clear is whether the prosecutor's actions were wholly unnecessary to the proper performance of his duties. At first blush, it appears the only reason the prosecutor refused to go forward with Sheridan's sentencing was to render him unavailable for the defense. But the record reveals another possible motivation. When pressed for an explanation of his actions, the prosecutor told the court, "I can't let Sheridan plead before Mr. Amos testifies." This suggests the prosecutor intended to call Sheridan to impeach Amos if Amos lied on the stand. But this would be difficult to do if Sheridan was already sentenced and then, having acquired the benefit of his plea bargain, decided not to cooperate with the prosecution. By keeping Sheridan's plea bargain on the table until after Woods's trial, the prosecutor avoided this potentiality. This was a legitimate tactical decision that was reasonably related to the prosecutor's interest in ensuring that his key witness—Amos—testified truthfully.

■ However, even if the first two elements needed to establish a claim of prosecutorial misconduct were satisfied, Woods could not prove that Sheridan's testimony was a material component of his defense. In *United States v. Valenzuela-Bernal* (1982) 458 U.S. 858 [73 L.Ed.2d 1193, 102 S.Ct. 3440], a case involving the deportation of potential defense witnesses, the court explained the materiality requirement is inextricably related to the notion of prejudice. Not only must the defendant provide "some explanation of how [the unavailable witness's] testimony would have been favorable and material," no due process violation will be found unless the absence of this testimony " 'fatally infected the trial' " and " 'necessarily prevent[ed] a fair trial.' [Citation.]" (*Id.* at p. 872.)

■ With that in mind, courts have rejected Sixth Amendment/due process claims when the defendant is given the opportunity to present statements of an unavailable witness through other witnesses. For example, in *Buie v. Sullivan* (2d Cir. 1990) 923 F.2d 10, Buie's accomplice was expected to

testify that Buie was not involved in the subject robberies. However, that expectation was erased when the accomplice was arrested mid-trial and then invoked his right to remain silent. Nonetheless, because the accomplice's exculpatory statements were admitted through another witness, i.e., because "Buie was able 'to obtain comparable evidence by other reasonably available means,' " the court found no constitutional violation. (*Id.* at p. 12.)

The court reached a similar result in *United States v. Capozzi* (8th Cir. 1989) 883 F.2d 608. Capozzi argued he was denied his right to present exculpatory testimony from certain unindicted coconspirators who pled the Fifth after the government filed a bill of particulars against them on the eve of trial. However, the court found Capozzi's due process assertion to be "chimerical" because the trial court "permitted Capozzi's trial counsel to present as evidence relevant portions of earlier sworn deposition testimony given by" those individuals. (*Id.* at p. 615.) Indeed, as the *Capozzi* court explained, the trial court "permitted Capozzi's trial counsel to present to the jury as much of this material as he deemed necessary to his defense. On appeal, Capozzi fails to delineate any suggested testimony over and above that which was presented to the jury. In our view, Capozzi was permitted to present his version of the facts to the jury. There was no violation of appellant's right to compulsory process." (*Ibid.*)

Likewise, here, the defense was given every opportunity to present Sheridan's statements to the jury, and it took full advantage of that opportunity. Not only did it elicit Sheridan's statements from various witnesses, it also confronted many witnesses with statements attributed to Sheridan. As set forth above, these statements effectively allowed for the impeachment of Amos and also provided evidence Sheridan and Amos wanted to kill McKenna for their own reasons.

Woods notes he made a detailed pretrial offer of proof regarding Sheridan's proposed testimony. But Woods fails to acknowledge that nearly every statement in that four-page document was either introduced into evidence or used by his attorneys in their examination of witnesses. Woods utterly "fails to delineate any suggested testimony over and above that which was presented to the jury." (*United States v. Capozzi, supra,* 883 F.2d at p. 615.) From this, we may logically conclude Woods was allowed to present his version of the facts to the jury, and that is all the constitution requires.

■ We recognize, of course, that the trial court's ruling deprived Woods of the opportunity to examine Sheridan on the witness stand and use his "live testimony" to undermine the prosecution's case. But "[t]he right to present a defense, and its concomitant right to compulsory process, are not unqualified . . . ." (*Buie v. Sullivan, supra,* 923 F.2d at p. 11.) Those rights do not entitle the defendant to compel a witness to waive his Fifth Amendment privilege. (*United States v. Moore* (9th Cir. 1982) 682 F.2d 853, 856.)

■ Nevertheless, Woods claims Sheridan voluntarily waived his Fifth Amendment privilege by accepting the People's plea bargain and agreeing to testify for the prosecution. The position is not well taken. Although Sheridan obviously wanted to accept the plea bargain, that deal had not been struck. As an unconvicted, unsentenced defendant, Sheridan retained his Fifth Amendment rights with respect to the offenses alluded to in the proposed plea agreement. (*United States v. Paris* (9th Cir. 1987) 827 F.2d 395, 399; *Taylor v. Best* (4th Cir. 1984) 746 F.2d 220, 222; *Mills v. United States* (4th Cir. 1960) 281 F.2d 736, 741; *People v. Fonseca* (1995) 36 Cal.App.4th 631 [42 Cal.Rptr.2d 525].)

■ Then there was the issue of Sheridan's exposure for other offenses. During the pretrial hearing, the prosecutor represented "[t]here's also other crimes he's been accused of by defense representatives which they will want to get into, such as being a felon with a firearm or using drugs or being engaged in other murders. So it is not simply the issue of this murder. There's a whole host of crimes that the defense will want to get into and doors they'll want to open." Because Sheridan's plea agreement did not provide him sanctuary from these crimes, he was entitled to invoke his right against self-incrimination for this reason as well. (*United States v. Pierce* (9th Cir. 1977) 561 F.2d 735, 738; *United States v. Johnson* (1st Cir. 1973) 488 F.2d 1206, 1209–1210.)

To summarize, the trial court properly found that Sheridan did not waive his Fifth Amendment rights by agreeing to plead guilty under the government's proposed plea agreement. In addition, the court properly determined that Sheridan's unavailability did not deprive Woods of his right to present a defense or due process. No constitutional violation has been shown.

## II

Woods also argues the police violated his right to counsel under *Massiah v. United States* (1964) 377 U.S. 201 [12 L.Ed.2d 246, 84 S.Ct. 1199] by using Amos to elicit incriminating statements from him at the deli. Although formal charges had not been brought against Woods at that time, the police had the deli surrounded and they were in the process of serving search warrants at Woods's clubs and residence. In Woods's opinion, this means the case had shifted from investigation to accusation, thereby triggering his right to counsel. At the very least, he maintains the matter should be remanded for an evidentiary hearing on the issue. No such hearing is required because the undisputed facts establish Woods's Sixth Amendment rights were not violated.

■ Under *Massiah*, the prosecution may not use evidence obtained in violation of the defendant's Sixth Amendment right to counsel. (*Massiah v.*

*United States, supra,* 377 U.S. at p. 207.) The United States Supreme Court has stated the right to counsel attaches only after the defendant has been subjected to adversarial judicial proceedings through formal charges, preliminary hearing, indictment, information or arraignment. (See, e.g., *United States v. Gouveia* (1984) 467 U.S. 180, 187 [81 L.Ed.2d 146, 104 S.Ct. 2292]; *Kirby v. Illinois* (1972) 406 U.S. 682, 689 [32 L.Ed.2d 411, 92 S.Ct. 1877].) The Supreme Court has also stated the right to counsel "becomes applicable *only when the government's role shifts from investigation to accusation.* For it is only then that the assistance of one versed in the 'intricacies . . . of law' [citation] is needed to assure that the prosecution's case encounters 'the crucible of meaningful adversarial testing.' [Citation.]" (*Moran v. Burbine* (1986) 475 U.S. 412, 430 [89 L.Ed.2d 410, 106 S.Ct. 1135], italics added.)

Seizing on the italicized phrase, a few courts have held open the possibility that a case could shift from investigation to accusation before the filing of formal charges. (See, e.g., *Roberts v. Maine* (1st Cir. 1995) 48 F.3d 1287, 1291 ["We recognize the possibility that the right to counsel might conceivably attach before any formal charges are made"] and the dissenting opinion in *United States v. Hayes* (9th Cir. 2000) 231 F.3d 663, upon which Woods relies, which equated the taking of material witness depositions with the initiation of formal charges.) But the United States Supreme Court has never given credence to this view, and in "determin[ing] when Sixth Amendment rights attach, the California Supreme Court follows the holdings of the United States Supreme Court." (*People v. Wheelock* (2004) 117 Cal.App.4th 561, 566 [11 Cal.Rptr.3d 796] [right to counsel does not attach during extradition proceedings].) Thus far, the Supreme Court has recognized attachment of the right to counsel only "after the first formal charging proceeding." (*Moran v. Burbine, supra,* 475 U.S. at p. 428; see generally Montana & Galotto, *Right to Counsel: Courts Adhere to Bright-Line Limits* (2001) 16 Crim. J. 4.)

But even if there were still fluidity in the law on this issue, our holding would be the same. It is clear to us the prosecution was still at the investigatory, factfinding stage when it enlisted Amos to talk with Woods. True, Amos was trying to elicit incriminating statements from Woods, but that's precisely what the police do when they are trying to make a case against a suspect through means of an interrogation. "For an interrogation, no more or less than for any other 'critical' pretrial event, the possibility that the encounter may have important consequences at trial, standing alone, is insufficient to trigger the Sixth Amendment right to counsel. As *Gouveia* made clear, until such time as the ' " 'government has committed itself to prosecute, and . . . the adverse positions of the government and defendant have solidified' " ' the Sixth Amendment right to counsel does not attach. [Citations.]" (*Moran v. Burbine, supra,* 475 U.S. at p. 432.)

 Despite the secret recording of Woods, the search warrants, and the police presence at the deli, we hold there was no Sixth Amendment violation in this case. "Any other [result] would be inconsistent with the United States Supreme Court's recognition that, before the formal instigation of charges, the investigative functions of the police should not be 'unnecessarily frustrate[d]' by overprotective application of the Sixth Amendment. [Citations.]" (*People v. Wheelock, supra,* 117 Cal.App.4th at p. 569, fn. omitted.)

The judgment is affirmed.

Aronson, J., and Fybel, J., concurred.

Appellant's petition for review by the Supreme Court was denied October 27, 2004.