**Michael WOODS, Petitioner,**

v.

**Deral ADAMS, Warden, Respondent.**

**Case No. SACV 06–69–AG (JWJ).**

United States District Court,
C.D. California.

June 30, 2009.

Dennis P. Riordan, Donald M. Horgan, Riordan & Horgan, San Francisco, CA, for Petitioner.

Douglas P. Danzig, Susan E. Miller, CAAG Office of Attorney General of California, San Diego, CA, for Respondent.

## ORDER ADOPTING FINAL REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

ANDREW J. GUILFORD, District Judge.

Pursuant to 28 U.S.C. § 636(b)(1)(C), the Court has reviewed the instant Petition for Writ of Habeas Corpus and other papers along with the attached Final Report and Recommendation of the United States Magistrate Judge, and has made a *de novo* determination of the Final Report and Recommendation. Further, the Court has engaged in a de novo review of those portions of the Report to which Petitioner has objected. The Court concurs with and adopts the conclusions of the Magistrate Judge.

IT IS ORDERED that a Judgment be entered dismissing the instant Petition for Writ of Habeas Corpus with prejudice.

IT IS FURTHER ORDERED that the Clerk shall serve forthwith a copy of this Order and the Judgment of this date on Petitioner.

## JUDGMENT

Pursuant to the Order of the Court approving the recommendations of the United States Magistrate Judge, and adopting the same as the facts and conclusions of law herein,

IT IS ADJUDGED that Judgment be entered dismissing the instant Petition for Writ of Habeas Corpus with prejudice.

## FINAL REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

JEFFREY W. JOHNSON, United States Magistrate Judge.

This Final Report and Recommendation is submitted to the Honorable Andrew J. Guilford, United States District Judge, by United States Magistrate Judge Jeffrey W. Johnson, pursuant to 28 U.S.C. § 636 and General Order. 05–07 of the United States District Court for the Central District of California. For the reasons discussed below, it is recommended that the instant Petition for Writ of Habeas Corpus be dismissed with prejudice.[1]

### I. INTRODUCTION

On January 24, 2006, Petitioner Michael Woods ("Petitioner"), a California state prisoner represented by counsel in this action, filed a "Verified Petition for Writ of Habeas Corpus." On May 31, 2006, Petitioner filed a "First Amended Verified Petition for a Writ of Habeas Corpus" (hereinafter simply "Petition" or "FAP"), together with a "Memorandum in Support of First Amended Verified Petition [etc.]" ("FAP Mem"). Petitioner seeks relief from a conviction on September 7, 2001 in the Orange County Superior Court for the murder in March 1989 of his former strip club business partner, Horace McKenna

---

1. Petitioner filed Objections on April 21, 2009 to the Magistrate Judge's original Report and Recommendation (filed on February 25, 2009). This Final Report and Recommendation is substantively identical to the original Report and Recommendation. However, this Final Report and Recommendation differs from the original Report and Recommendation as follows: an updated citation to *Moses v. Payne*, 555 F.3d 742, 754 (9th Cir.2009) has been added at page 10; and a citation to "RT 1283–1375" at page 41 corrects what was originally an incomplete citation to the record. Other minor typographical and citation errors have also been corrected. Since no substantive changes have been made in this Final Report and Recommendation, a period for further objections to this Final Report and Recommendation is not warranted.

("McKenna"), in violation of California Penal Code § 187(a). Evidence was presented at trial that Petitioner arranged for David Amos ("Amos"), one of Petitioner's employees, to kill McKenna, and that Amos in turn hired John Sheridan ("Sheridan") to carry out the murder, and that it was Sheridan who ultimately shot McKenna. In his defense, Petitioner argues that Amos had his own reasons for wanting to kill McKenna, and that Amos was solely responsible for hiring Sheridan to kill McKenna, and that Amos falsely implicated Petitioner so that Amos could obtain a favorable plea agreement. (*See* FAP Mem 5–6.) A jury found Petitioner guilty, and the trial court sentenced Petitioner to 25–years–to–life in prison. (Clerk's Transcript on Appeal ["CT"] 809–811.) [2]

Petitioner appealed the conviction to the California Court of Appeal, and that appeal was denied in a reasoned, published opinion, *People v. Woods*, 120 Cal.App.4th 929, 16 Cal.Rptr.3d 174 (2004) (hereinafter "*Woods*"). Petitioner filed a petition for review with the California Supreme Court, and that petition was denied without comment on October 27, 2004. (*See* Lodgment Items Nos. 2, 3.) Petitioner did not file any petitions for a writ of habeas corpus with the state courts. (*See* FAP 3:19–23.)

On July 14, 2006, Respondent Warden Deral Adams ("Respondent") filed an Answer to the Petition ("Answer"), together with a "Memorandum of Points and Authorities in Support of Answer to Petition [etc.]" ("Answer Mem"). On September 8, 2006, Petitioner filed a "Verified Traverse in Support of First Amended Petition [etc.]" ("Traverse"), together with a

"Memorandum in Support of Petitioner's Verified Traverse" ("Trav Mem").

The Petition presents two grounds for relief: (1) the prosecutor committed misconduct when he offered a plea agreement to Sheridan and then refused to call Sheridan as a prosecution witness or to immunize Sheridan, thereby improperly influencing Sheridan to claim the Fifth Amendment privilege against self-incrimination and refuse to testify if called for direct examination by Petitioner; and (2) the trial judge improperly allowed Sheridan to claim the Fifth Amendment privilege and refuse to testify in Petitioner's defense under the circumstances.

## II. FACTUAL BACKGROUND

The following statement of facts is excerpted from the California Court of Appeal's opinion in *Woods:* [3]

Shortly after midnight on March 9, 1989, McKenna was gunned downed by machine gun fire as he returned to his Carbon Canyon home in the back of a limousine. It is undisputed Sheridan was the shooter. The only question for the jury was whether Petitioner instigated the hit.

Petitioner and McKenna met while working as California Highway Patrol officers. Upon leaving the highway patrol, they went into the strip club business. That was 1977. By 1980, they had three clubs and business was good. However, not all was well between them. McKenna was a huge, intimidating man who witnesses said liked to "live large" and "throw his weight around." And

---

**2.** Petitioner was charged with murder for financial gain and by means of lying in wait. The jury convicted him of murder for financial gain, but the court struck the special circumstance. (*See* CT 810.)

**3.** This Court has substituted the term "Petitioner" for the name "Woods" throughout the Court of Appeal's opinion as quoted herein and as discussed below. Also, bracketed material has been added to the facts quoted, including citations to the record and names of witnesses.

according to people in the clubs, he often imposed himself on Petitioner and made life difficult for him. At one point, Petitioner asked a bouncer [*i.e.*, witness David Smith ("Smith"); *see* Reporter's Transcript on Appeal ("RT") 1141 *et seq.*] if he would kill McKenna for $30,000. When [Smith] declined—and then revealed the offer to others—Petitioner gave [Smith] his walking papers. [RT 1144–1147, 1207–1208.]

In the early 1980's, Petitioner hired David Amos to work in the clubs. Over time, it became apparent to Amos that Petitioner and McKenna did not get along. And because Amos was friendly with Petitioner, he was *persona non grata* with McKenna. This worried Amos because he considered McKenna to be very dangerous.

So did Petitioner. And in 1988, his fear of McKenna gathered more gravitas when McKenna threatened to have [Petitioner's] daughters raped. [RT 1239.] Petitioner told Amos about the threat and asked him if he would help him kill McKenna. Amos said he would. [RT 1239–1241.] Sometime later, Petitioner was overheard to say he was going to kill McKenna. [RT 1393.]

Actually, though, Amos ended up hiring Sheridan for the job. Petitioner had allotted $50,000 for the hit, but Amos only gave Sheridan about half of that. According to Amos, Petitioner had no contact with Sheridan, and Sheridan did not know Petitioner was behind the scheme. In fact, Amos told Sheridan he wanted McKenna killed for his own protection. [RT 1334–1336, 1360–1361, 1366.] Following the murder, Amos became Petitioner's new partner. However, their relationship soured when Amos came to suspect Petitioner was embezzling money from the clubs. Amos threatened legal action and tried to obtain greater control over the clubs by making business deals without Petitioner's knowledge.

It took the police nearly a decade to piece the case together. Eventually, Sheridan confessed to the shooting and worked with authorities to implicate Amos. Investigators then used Amos to get Petitioner. In exchange for leniency, Amos agreed to meet with Petitioner and wear a wire so the police could listen to their conversation.

The meeting was held at a Los Angeles deli [*i.e.*, "Jerry's Famous Deli" in Woodland Hills, California; *see* CT 457–482.] To get Petitioner talking about the murder, Amos told him Sheridan was pestering him for money. Petitioner advised Amos not to give [Sheridan] any, because it would look like an admission. Amos then told Petitioner that Sheridan suspected [Petitioner] was behind the murder. This took Petitioner by surprise, but he was confident the police would not be able to prove his involvement, He was confident the police were only on to him for tax evasion and did not "have shit on the other thing." Toward the end of the conversation, [Petitioner] asked Amos what ever happened to the murder weapon, and Amos assured him Sheridan had thrown it away.

As Petitioner was leaving the deli, the police placed him under arrest.

*Woods,* 120 Cal.App.4th at 932–934, 16 Cal. Rptr.3d 174 (bracketed material added).

This Court also notes the following pertinent facts, based on its own review of the record: Voir dire was complete and the jury and alternates had been sworn in when the prosecutor announced that he would not be calling Sheridan, and the parties then discussed with the trial judge the impact that Sheridan's unavailability, due to his invocation of the Fifth Amendment, was going to have on the trial. (*See*

RT 599 *et seq.*) At that time, the trial judge stated "here is my situation. A continuance is basically tantamount to a mistrial. We can't ask this jury to just have a seat for 60 days and wait [for Sheridan to be sentenced]. So the preference is to avoid that, if possible." (RT 604:16–19.)

## II. STANDARD OF REVIEW

The Anti–Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), was enacted on April 24, 1996 and applies to all federal petitions for writs of habeas corpus filed after that date. *Lindh v. Murphy,* 521 U.S. 320, 117 S.Ct. 2059, 2063, 138 L.Ed.2d 481 (1997); *Jeffries v. Wood,* 114 F.3d 1484, 1499 (9th Cir.1997). Since the instant Petition was filed after April 24, 1996, AEDPA applies.

Under AEDPA, a petition for writ of habeas corpus by a prisoner in custody pursuant to the judgment of a state court shall not be granted with respect to any claim that was adjudicated on the merits in state court proceedings unless the adjudication of the claim "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1), (2).

■ The Supreme Court has explained the standard of review under AEDPA as follows:

Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the United States Supreme Court] on a question of law or if the state court decides a case differently than [the Unites States Supreme Court] has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the United States Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Williams v. Taylor,* 529 U.S. 362, 412–13, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). Even if the state court fails to cite or acknowledge United States Supreme Court authority, a Federal court may not grant habeas relief unless the state court's reasoning or result contradict clearly established United States Supreme Court precedent. *See Early v. Packer,* 537 U.S. 3, 8, 123 S.Ct. 362, 154 L.Ed.2d 263 (2002).

■ The phrase "clearly established Federal law, as determined by the Supreme Court of the United States," as set forth in 28 U.S.C. § 2254(d)(1), "refers to the holdings, as opposed to the dicta, of this Court's decisions as of the time of the relevant state court decision." *Williams v. Taylor,* 529 U.S. at 412, 120 S.Ct. 1495; *see also Lockyer v. Andrade,* 538 U.S. 63, 71, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003). Only after the clearly established federal law is identified can a federal habeas court determine whether a state court's disposition of a claim "resulted in a decision that was contrary to, or involved an unreasonable application of" such law. *Cooper v. Brown,* 510 F.3d 870, 920 (9th Cir.2007), (*citing Lockyer v. Andrade,* 538 U.S. at 71–72, 123 S.Ct. 1166). A federal habeas court must identify the relevant United States Supreme Court authority and then apply that law to the record in the light most favorable to the state court decision. *Cooper v. Brown,* 510 F.3d at 919–924.

■ Ninth Circuit case law and the decisions of other federal courts may be "persuasive authority for purposes of determining whether a particular state court

decision is an 'unreasonable application' of Supreme Court law, and also may help ... determine what law is 'clearly established.'" *Cooper v. Brown,* 510 F.3d at 920 (*quoting Duhaime v. Ducharme,* 200 F.3d 597, 600 (9th Cir.2000).) *See also Robinson v. Ignacio,* 360 F.3d 1044, 1057 (9th Cir.2004). However, the Ninth Circuit has recognized that because of the 1996 AEDPA amendments, a federal habeas court can no longer reverse a state court decision merely because that decision conflicts with Ninth Circuit precedent or precedent from other circuits on a federal Constitutional issue. *See Duhaime v. Ducharme,* 200 F.3d at 600; *Robinson v. Ignacio,* 360 F.3d at 1057.

■ Furthermore, in a federal habeas proceeding, "a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C § 2254(e)(1). "Clear and convincing evidence" within the meaning of § 2254(e) requires greater proof than preponderance of the evidence; the evidence must produce "an abiding conviction" that the factual contentions advanced by the applicant are "highly probable." *Cooper v. Brown,* 510 F.3d at 919. Furthermore, unarticulated findings that are necessary to the state court's conclusions of mixed questions of fact and law are presumed correct. *Id.* (citations omitted). When there are two permissible views of the evidence, a factfinder's choice between them cannot be clearly erroneous. *Id.*

■ In applying these standards, a federal habeas court looks to the last reasoned state court decision. *See Davis v. Grigas,* 443 F.3d 1155, 1158 (9th Cir.2006). "Where there has been one reasoned state court judgment rejecting a Federal claim, [Federal habeas courts should presume that] later unexplained orders upholding that judgment or rejecting the same claim

rest upon the same ground." *Ylst v. Nunnemaker,* 501 U.S. 797, 803, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991). With respect to those claims for which there is no reasoned state court decision, *e.g.,* when the state court does not supply reasoning for its decision, a Federal habeas court will conduct an independent review of the record to determine whether the state court decision was contrary to, or an unreasonable application of, controlling United States Supreme Court precedent. *See Allen v. Ornoski,* 435 F.3d 946, 954–955 (9th Cir.2006) (*citing, inter alia, Delgado v. Lewis,* 223 F.3d 976, 982 (9th Cir.2000)).

■ Whether a state court's application of a clearly established rule of Federal law, as determined by the Supreme Court, is reasonable may depend on the "specificity" or "generality" of the rule. *See Yarborough v. Alvarado,* 541 U.S. 652, 663, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004). Where a legal rule is specific, the range of "reasonable" judgment may be narrow. *See id.* at 664, 124 S.Ct. 2140. However, applying a general rule to a specific case can demand a substantial element of judgment, in which case a state court would have more leeway in reaching a "reasonable" outcome in a case-by-case determination. *Id.*

■ Where the Supreme Court has not issued a holding regarding a claimed constitutional right, a state court adjudication on the issue of such a claimed right generally cannot be contrary to, or an unreasonable application of, clearly established federal law. *See Kane v. Espitia,* 546 U.S. 9, 9, 126 S.Ct. 407, 163 L.Ed.2d 10 (2005) (no federal habeas relief where circuit courts split and no Supreme Court holding on claimed right); *Stenson v. Lambert,* 504 F.3d 873, 881 (9th Cir.2007) (*citing Kane*). *See also Wright v. Van Patten,* 552 U.S. 120, ——, 128 S.Ct. 743, 747, 169 L.Ed.2d 583 (2008) (where Su-

preme Court cases give no clear answer to question presented, habeas relief under § 2254(d)(1) is not warranted). Furthermore, "[a] federal court may not overrule a state court for simply holding a view different from its own, when the precedent from [the Supreme] Court is, at best, ambiguous." *Mitchell v. Esparza*, 540 U.S. 12, 17, 124 S.Ct. 7, 157 L.Ed.2d 263 (2003). Where an issue of a claimed constitutional right is an "open question" in Supreme Court jurisprudence, a petitioner is not entitled to federal habeas relief for a state court's alleged violation of that right. *See also Carey v. Musladin*, 549 U.S. 70, 76–77, 127 S.Ct. 649, 166 L.Ed.2d 482 (2006). Stated another way, when a Supreme Court decision does not "squarely address" an issue in a case or establish a legal principle that "clearly extends" to a new context, it cannot be said that there is "clearly established" Supreme Court precedent, and therefore the federal habeas court must defer to the state court's decision. *Moses v. Payne*, 555 F.3d 742, 754 (9th Cir.2009) (*citing, inter alia, Carey v. Musladin* and *Wright v. Van Patten*). In such situations, the Ninth Circuit has noted that *"Musladin* underscores that § 2254(d)(1) tightly circumscribes the granting of habeas relief." *Crater v. Galaza*, 491 F.3d 1119, 1123 (9th Cir.2007).

## III. DISCUSSION

### A. Ground One: Prosecutorial Misconduct

Petitioner contends that the prosecutor committed misconduct when he offered Sheridan a plea bargain and then refused to call Sheridan as a prosecution witness, effectively inducing Sheridan to invoke the Fifth Amendment and refuse to testify, in order to preserve his plea bargain, when Petitioner proposed to call him to testify on direct examination in Petitioner's defense. Petitioner argues that, under the circumstances, the prosecutor's refusal to grant use immunity to Sheridan was misconduct. Petitioner also argues that the prosecutor's refusal to consummate Sheridan's plea bargain, so that Sheridan could be sentenced before trial—which would have arguably allowed Sheridan to be immunized after sentencing and then testify when called directly by Petitioner—constituted misconduct as well. Petitioner also argues that the prosecutor's refusal to consent to a stipulation limiting the scope of Sheridan's testimony, in order to obviate any self-incriminating areas of examination if Sheridan was called to testify by Petitioner, was also misconduct.[4]

---

4. Petitioner characterizes the terms of Sheridan's proposed plea agreement as follows:

 Sheridan's plea bargain was expressed in a form entitled "Guilty Plea in Superior Court" filled out in the name of "John Patrick Sheridan" but unsigned. (CT 561–563). It required Sheridan to plead guilty only to voluntary manslaughter (Cal.Penal Code § 192(a)), attempted murder (Cal.Penal Code §§ 664 and 187(a)), solicitation of murder (Cal.Penal Code § 653f(b)), discharging a firearm in a grossly negligent manner (Cal.Penal Code § 246.3), and two weapon possession counts plus enhancements, for a total maximum punishment of 20 years; the special circumstances murder charge for which he could have received a death sentence would be dismissed. (CT 561–563.) The form also required Sheridan to "waive and give up" his right to not "be a witness against myself, and remain silent if I so choose." (CT 561–563.)

 FAP Mem n. 2. The plea agreement in the record is unsigned. (*See* CT 561–563.) Respondent does not dispute these facts as summarized by Petitioner. This Court also notes that the trial judge characterized Sheridan's deal as "he's going to get 20 years ... and part of the deal is that he testify truthfully, if called by the prosecution, and should he not be called at all, he's going to get the 20 years." (RT 698.) The trial judge said "if either side thinks that's incorrect or something should be added to that, I'll listen to it." (RT 698.) Neither side made any comment. (RT 698.)

### 1. *State opinion regarding prosecutorial misconduct*

The California Court of Appeal's opinion in *Woods* is the last reasoned state court decision on this claim, and so this Court analyzes the *Woods* opinion to determine if the state courts' denial of this claim was contrary to, or involved an unreasonable application of, clearly established Federal law. *See* 28 U.S.C. § 2254(a)(1); *Davis v. Grigas*, 443 F.3d at 1158.

The Court of Appeal set forth a detailed procedural and factual history regarding this claim as follows:

> The prosecutor originally designated Sheridan as a witness. However, after the jury was sworn, the prosecutor announced he did not intend to call Sheridan after all. This caused the defense great consternation. Claiming Sheridan was the "linchpin" to its case, the defense sought to call Sheridan as its own witness. However, Sheridan's attorney said he would advise Sheridan to invoke his Fifth Amendment right against self-incrimination because his plea agreement with the prosecution had yet to be consummated. [RT 602 *et seq.*]

> Under [Sheridan's plea] agreement, the prosecution would dismiss the charge of capital murder in exchange for Sheridan's guilty plea to manslaughter and other allegations carrying a 20–year sentence. The prosecutor informed the court the agreement was brought about by Sheridan's willingness to work with authorities and was contingent on his continued cooperation, meaning he would have to testify truthfully if called by the prosecution. The prosecutor made no bones about the fact he was not going to execute the agreement until Petitioner's trial was over. Sheridan's attorney made it equally clear Sheridan would not testify for Petitioner until Sheridan was sentenced. Believing this presented a potential due process prob-

> lem, the court invited briefing from the parties and set the matter for a hearing. [RT 608.]

> The defense papers did not mince words: "In its strategic effort to make Sheridan unavailable as a witness, the prosecutor provided Sheridan and his counsel with a written proposed plea agreement, but has delayed execution of that agreement until after Petitioner's trial ... [t]hereby technically allowing for the assertion of the Fifth Amendment under just the circumstances that have arisen here. What is implicit in this arrangement is that the prosecution has made Sheridan's deal contingent upon his not being available to the defense. This is nothing short of misconduct on the part of the prosecution." [CT 551.]

> The defense proposed an assortment of remedies to address the situation. First, it asked the court to dismiss the case, declare a mistrial, or exclude Amos' testimony. Then it suggested various means to secure Sheridan's testimony, such as granting him judicial immunity or continuing Petitioner's trial until Sheridan was sentenced. The defense also argued Sheridan had waived his Fifth Amendment rights by accepting the plea bargain and agreeing to testify for the prosecution.

> The court held a lengthy hearing on the matter. [*See* RT 602–614; 615–699.] Although it did not expressly impugn the prosecutor's motives, it did recognize Sheridan's availability "is, to a certain extent, controlled by the People because the People have pending a deal" with [Sheridan]. The court said it would take "an idiot" not to see that "in order for [Sheridan] to protect himself, he's got to do what will maintain this deal with the prosecution. Which is, if the prosecution is not calling [him], just sit there and shut up." [RT 671.]

While the court believed the prosecution was at least partly responsible for Sheridan's decision to take the Fifth, it did not believe this warranted dismissing the case, declaring a mistrial, or excluding Amos' testimony. Nor did it believe a continuance would solve anything, given the prosecutor's refusal go forward [sic] with Sheridan's plea agreement prior to the completion of Petitioner's trial. The court did believe there was a "pretty good case" for granting Sheridan judicial immunity, but in the end it rejected this option as unprecedented.

The court then discussed the prospect of allowing the defense to introduce Sheridan's statements through other witnesses. To accommodate Petitioner's due process rights, the court said it would be willing to relax the hearsay rule and afford the defense wide latitude as far as admitting Sheridan's statements into evidence. It also promised to instruct the jury Sheridan's out-of-court statements could be considered for their substantive truth. [*See, e.g.,* RT 678–683.]

When asked about this approach, the defense admitted it would be able to get all of Sheridan's statements into evidence through other witnesses. [RT 626.] However, it insisted this would not be a suitable substitute for examining Sheridan on the witness stand. The court rejected this position, saying, "It is not necessarily a constitutional violation for a defendant not to be able to present their case in the way that they would like to present it, as opposed to getting the substance of the evidence in." Believing the defense could get the substance of Sheridan's statements into evidence through other witnesses, the court ruled Sheridan's unavailability did not amount to a violation of Petitioner's constitutional rights.

At trial, the defense was given free reign in terms of admitting Sheridan's statements into evidence. It used his statements to impeach Amos' version of events and show Amos and Sheridan had the most to gain from McKenna's demise. It also used [Sheridan's] statements to prove Sheridan and Amos hated Petitioner so much they would be willing to falsely implicate him in McKenna's murder. And, as promised, the court instructed the jury it could consider Sheridan's statements for their substantive truth. [RT 2036.]

*Woods* at 934–936, 16 Cal.Rptr.3d 174 (bracketed material added).

The Court of Appeal then began its analysis of this claim by discussing a California Supreme Court case, *People v. Lucas,* 12 Cal.4th 415, 48 Cal.Rptr.2d 525, 907 P.2d 373 (1995), *cert. denied,* 519 U.S. 838, 117 S.Ct. 114, 136 L.Ed.2d 66 (1996) ("*Lucas* "), which sets forth a three-part test to establish what the Court of Appeal described as "a violation of ... compulsory process rights." *See Woods* at 936, 16 Cal.Rptr.3d 174. The Court of Appeal stated that under *Lucas* a defendant must demonstrate: (1) prosecutorial misconduct, *i.e.,* "conduct that was entirely unnecessary to the proper performance of the prosecutor's duties and was of such a nature as to transform a defense witness willing to testify into one unwilling to testify"; (2) the prosecutor's misconduct was a "substantial cause" in depriving the defendant of the witness's testimony; and (3) the unavailable testimony was "material" to the defense. *Woods* at 936, 16 Cal. Rptr.3d 174 (internal quotation marks and citations omitted).

The Court of Appeal then considered the second element first, noting that, although Sheridan's counsel did advise him to take the Fifth, "this advice was precipitated by the prosecutor's decision not to call Sheri-

dan." *Woods* at 936–937, 16 Cal.Rptr.3d 174. Consequently, the Court of Appeal found that "it is clear the prosecutor's actions were a substantial cause in keeping Sheridan off the stand." *Woods* at 936, 16 Cal.Rptr.3d 174. The Court of Appeal stated that "the prosecutor had the prerogative [not to call Sheridan], of course." *Woods* at 937, 16 Cal.Rptr.3d 174. But the Court of Appeal went on to note that the prosecutor "said he was going to put off Sheridan's sentencing until [Petitioner's] trial was over," and the Court of Appeal said that "this left Sheridan with little choice" other than to take the Fifth "rather than testify for the defense and risk losing his plea agreement, which enabled [Sheridan] to avoid prosecution for capital murder." *Id.* The Court of Appeal then stated that, under the second prong of the *Lucas* test, "the requisite link between the prosecutor's conduct and Sheridan's refusal was sufficiently established." *Id.*

The Court of Appeal next went on to analyze the first prong of the *Lucas* test, whether the prosecutor's actions amounted to misconduct under the state law standard. *Id.* The Court of Appeal stated:

> Less clear is whether the prosecutor's actions were wholly unnecessary to the proper performance of his duties. At first blush, it appears the only reason the prosecutor refused to go forward with Sheridan's sentencing was to render him unavailable for the defense. But the record reveals another possible motivation. When pressed for an explanation of his actions, the prosecutor told the court, "I can't let Sheridan plead before Mr. Amos testifies." This suggests the prosecutor intended to call Sheridan to impeach Amos if Amos lied on the stand. But this would be difficult to do if Sheridan was already sentenced and then, having acquired the benefit of his plea bargain, decided not to cooperate with the prosecution. By keeping Sheridan's plea bargain on the table un-

til after Woods' trial, the prosecutor avoided this potentiality. **This was a legitimate tactical decision that was reasonably related to the prosecutor's interest in ensuring that his key witness—Amos—testified truthfully.**

*Woods* at 937, 16 Cal.Rptr.3d 174 (emphasis added).

Lastly, the Court of Appeal stated that regardless of whether the first two prongs in the *Lucas* test were met, Petitioner could not satisfy the third prong: the requirement that Sheridan's testimony was a "material" component of Petitioner's defense. *Id.* In discussing this prong, the Court of Appeal cited several federal cases, including, *inter alia, United States v. Valenzuela–Bernal,* 458 U.S. 858, 102 S.Ct. 3440, 73 L.Ed.2d 1193 (1982), and stated that "the materiality requirement is inextricably related to the notion of prejudice." *Woods* at 937, 16 Cal.Rptr.3d 174. In analyzing this "materiality/prejudice" prong, the Court of Appeal stated that not only must the defendant provide some explanation of how the unavailable witness's testimony would have been "favorable and material," but the court also stated that "no due process violation will be found unless the absence of [the desired] testimony 'fatally infected the trial' and 'necessarily prevent[ed] a fair trial.'" *Woods* at 937, 16 Cal.Rptr.3d 174 (bracketed material added; internal quotations omitted). The Court of Appeal noted that "[t]he right to present a defense, and its concomitant right to compulsory process, are not unqualified." *Id.* (*citing Buie v. Sullivan,* 923 F.2d 10, 11 (2d Cir.1990)). The Court of Appeal then stated that "[t]hese rights do not entitle [Petitioner] to compel a witness to waive his Fifth Amendment privilege." *Woods* at 937, 16 Cal.Rptr.3d 174 (*citing United States v. Moore,* 682 F.2d 853, 856 (9th Cir.1982)).

The Court of Appeal then found, in considering the "materiality/prejudice" prong of the *Lucas* test, that "the defense was given every opportunity to present Sheridan's statements to the jury, and it took full advantage of that opportunity." *Woods* at 938, 16 Cal.Rptr.3d 174. The Court of Appeal noted that the defense made "a detailed offer of proof regarding Sheridan's proposed testimony" (*see* CT 569–573; *see also* RT 615, 650 *et seq.*). and found that ultimately "nearly every statement in that four-page [offer of proof] was either introduced into evidence or used by [Petitioner's] attorneys in their examination of witnesses." *Woods* at 938, 16 Cal. Rptr.3d 174. The Court of Appeal stated that "[f]rom this, we may logically conclude [Petitioner] was allowed to present his version of the facts to the jury, and that is all the constitution [sic] requires." *Id.*

2. *Legal standards on habeas review regarding Fifth and Sixth Amendment rights and prosecutorial misconduct.*

This Court's first task in analyzing the Court of Appeal's denial of this claim is to identify the relevant clearly established Federal law, as determined by the holdings of the United States Supreme Court, in order to determine whether the Court of Appeal's denial was "contrary to, or an unreasonable application of" that Federal law. *See Lockyer*, 538 U.S. at 71, 123 S.Ct. 1166 (*quoting* 28 U.S.C. § 2254(d)(1)); *Cooper v. Brown*, 510 F.3d at 920. This Court surveys the relevant clearly established Federal law on the issues of prosecutorial misconduct and the interplay between a witness's Fifth Amendment rights and the privilege against self-incrimination, a defendant's Sixth Amendment rights to present a defense and compel testimony, and a prosecutor's legal and ethical obligations in a criminal trial. After identifying the rele-

vant Supreme Court authority, this Court will apply that law to the record in the light most favorable to the state court decision. *See Cooper v. Brown*, 510 F.3d at 919–924.

a. *The Fifth Amendment*

▮ The Fifth Amendment to the United States Constitution provides, in pertinent part, that "[n]o person ... shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. The Fifth Amendment privilege against self-incrimination applies to evidence which may directly support a criminal conviction, information which would furnish a link in the chain of evidence that could lead to a prosecution, and evidence which an individual reasonably believes could be used against him in a criminal prosecution. *Maness v. Meyers*, 419 U.S. 449, 461, 95 S.Ct. 584, 42 L.Ed.2d 574 (1975) (*citing Hoffman v. United States*, 341 U.S. 479, 485–486, 71 S.Ct. 814, 95 L.Ed. 1118 (1951)). The Supreme Court has stated that the Fifth Amendment's provision against self-incrimination "must be accorded liberal construction in favor of the right it was intended to secure." *Hoffman v. United States*, 341 U.S. at 486, 71 S.Ct. 814 (citations omitted). In particular, a convicted but unsentenced defendant retains his Fifth Amendment rights. *United States v. Paris*, 827 F.2d 395, 399 (9th Cir.1987).

b. *The Sixth Amendment*

The Sixth Amendment provides, in pertinent part, that "[i]n all criminal proceedings, the accused shall enjoy the right ... to be confronted with the witnesses against him [and] to have compulsory process for obtaining witnesses in his favor...." U.S. Const. amend. VI.

▮ In discussing the Sixth Amendment, the Supreme Court has stated that "[f]ew rights are more fundamental than

that of an accused to present witnesses in his own defense." *Chambers v. Mississippi,* 410 U.S. 284, 302, 93 S.Ct. 1038, 1049, 35 L.Ed.2d 297 (1973). "The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the [factfinder] so it may decide where the truth lies.... This right is a fundamental element of due process of law." *Washington v. Texas,* 388 U.S. 14, 19, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967). *See also Ponte v. Real,* 471 U.S. 491, 510, 105 S.Ct. 2192, 2203, 85 L.Ed.2d 553 (1985) (*quoting Washington v. Texas,* 388 U.S. at 19, 87 S.Ct. 1920).

 However, the Supreme Court has stated that the Sixth Amendment right to confront and to cross-examine witnesses is not absolute and may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process. *See Chambers v. Mississippi,* 410 U.S. at 295, 93 S.Ct. 1038. More than the mere absence of testimony is necessary to establish a violation of the Sixth Amendment right to compulsory process. *United States v. Valenzuela–Bernal,* 458 U.S. at 867, 102 S.Ct. 3440 (*citing Washington v. Texas,* 388 U.S. at 16, 87 S.Ct. 1920). Furthermore, a criminal defendant's Sixth Amendment rights, such as the rights to confrontation and to compulsory process to secure the attendance of a witness, do not necessarily include the right to compel a witness to waive the Fifth Amendment privilege against self-incrimination. *See Kastigar v. United States,* 406 U.S. 441, 444–445, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972). *See also United States v. Vavages,* 151 F.3d 1185, 1191–1192 (9th Cir.1998) (*citing United States v. Moore,* 682 F.2d at 856); *United States v. Straub,* 538 F.3d 1147, 1166 (9th Cir.2008) (no Fifth Amendment right for defendant to demand use immunity for a co-defendant; courts must

be "extremely hesitant" to intrude on the Executive's discretion to decide whom to prosecute). An accused is generally not entitled to compel a prosecutor to grant immunity to a potential defense witness to get the witness to testify. *See United States v. Paris,* 827 F.2d at 399; *United States v. Trejo–Zambrano,* 582 F.2d 460, 464 (9th Cir.1978) (*citing United States v. Alessio,* 528 F.2d 1079, 1081 (9th Cir. 1976)).

c. *Prosecutorial misconduct*

 In considering "prosecutorial misconduct," the United States Supreme Court has stated that prosecutors must "refrain from improper methods calculated to produce a wrongful conviction." *Berger v. United States,* 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935). The appropriate standard of review for prosecutorial misconduct is the narrow one of due process and not the broad exercise of supervisory power. *See Darden v. Wainwright,* 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986). *See also Donnelly v. DeChristoforo,* 416 U.S. 637, 642, 94 S.Ct. 1868, 1871, 40 L.Ed.2d 431 (1974) (not every trial error which might call for supervisory power violates fundamental fairness). The Supreme Court has recognized that prosecutorial misconduct may "so infec[t] the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo,* 416 U.S. at 643, 94 S.Ct. 1868. A defendant's due process rights are violated when a prosecutor's misconduct renders a trial "fundamentally unfair." *Darden v. Wainwright,* 477 U.S. at 181, 106 S.Ct. 2464. *See also Greer v. Miller,* 483 U.S. 756, 765, 107 S.Ct. 3102, 97 L.Ed.2d 618 (1987); *Williams v. Stewart,* 441 F.3d 1030, 1042 (9th Cir.2006) (*citing Donnelly v. DeChristoforo,* 416 U.S. at 643, 94 S.Ct. 1868 as articulating standard for prosecutorial misconduct).

■ The Supreme Court has found that prosecutorial misconduct may occur in a variety of unique factual settings. *See United States v. Williams,* 504 U.S. 36, 60, 112 S.Ct. 1735, 118 L.Ed.2d 352 (1992) (Stevens, J., concurring) ("[l]ike the Hydra slain by Hercules, prosecutorial misconduct has many heads"). Each of these settings may have its own peculiar standards for finding prosecutorial misconduct and for determining whether a constitutional violation occurred as a result of such misconduct. *Compare Berger v. United States,* 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1935) (prosecutor's improper comments during trial and closing argument constituted misconduct and prejudice was probable); *Mooney v. Holohan,* 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791 (1935) (knowing use of perjured testimony was misconduct); *Miller v. Pate,* 386 U.S. 1, 87 S.Ct. 785, 17 L.Ed.2d 690 (1967) (prosecutor's knowing use of false evidence likely to have important effect on jury's determination and warrants habeas relief); *Caldwell v. Mississippi,* 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (prosecutor's misstatements of law in argument to jury was misconduct); and *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) (prosecutor's withholding of relevant exculpatory evidence violates constitutional due process) *with United States v. Valenzuela–Bernal,* 458 U.S. at 860, 867, 102 S.Ct. 3440 (deportation of defense witness by government did not violate Fifth or Sixth Amendment where respondent made no showing that witness's testimony was material and favorable to defense); *Darden v. Wainwright,* 477 U.S. at 181–182 and n. 14, 106 S.Ct. 2464 (prosecutor's comments in closing argument did not so infect trial with unfairness as to violate due process, and therefore no issue of whether misconduct was harmless error).

The Supreme Court has also recognized that government interference with a defense witness's free and unhampered choice to testify may amount to a violation of due process. *See Webb v. Texas,* 409 U.S. 95, 97–98, 93 S.Ct. 351, 353–354, 34 L.Ed.2d 330 (1972) (defense witness intimidated into not testifying by remarks of trial judge); *Washington v. Texas,* 388 U.S. at 19, 87 S.Ct. 1920 (right to present witness to establish defense is fundamental to due process; and right denied by Texas state statute prohibiting co-participants in same crime from testifying for each other when testimony was relevant and material to defense). The Ninth Circuit has extended this rule to bar undue prosecutorial interference in a defense witness's decision to testify. *See Earp v. Ornoski,* 431 F.3d 1158, 1167–1168 (9th Cir.2005) (prosecutor's intimidating threats to witness to prevent witness from testifying may amount to misconduct; case remanded for evidentiary hearing) (*citing Webb v. Texas,* 409 U.S. at 98, 93 S.Ct. 351), *cert. denied,* 547 U.S. 1159, 126 S.Ct. 2295, 164 L.Ed.2d 834 (2006). *See also United States v. Vavages,* 151 F.3d at 1189 (prosecutor's conduct is governed by *Webb* ).

■ Where prosecutorial misconduct has occurred, the relevant question then is whether the misconduct so infected the trial with unfairness as to make the resulting conviction a denial of due process. *See Darden,* 477 U.S. at 181, 106 S.Ct. 2464; *Earp,* 431 F.3d at 1171. *See also Karis v. Calderon,* 283 F.3d 1117, 1128 (9th Cir. 2002) (claim of prosecutorial misconduct is analyzed under prejudice standard set forth in *Brecht v. Abrahamson,* 507 U.S. 619, 638 n. 9, 113 S.Ct. 1710, 123 L.Ed.2d 353 [1993] regardless of type of harmless error review conducted by the state courts).

### 3. *Discussion*

■ As the foregoing authorities illustrate, the analytical steps in a consideration of prosecutorial misconduct can vary

based on the unique factual settings and the various rights in tension in an individual case. This Court finds that in this case, a two-part inquiry is required. First, this Court must determine if the prosecutor's actions amounted to "misconduct." Second, if the prosecutor committed "misconduct," this Court must determine if such misconduct resulted in actual prejudice to Petitioner, such that his trial was rendered "fundamentally unfair." *See, e.g., Donnelly,* 416 U.S. at 637–648, 94 S.Ct. 1868 (ordinary trial error of a prosecutor does not warrant habeas relief); *United States v. Whitehead,* 200 F.3d 634, 640 (9th Cir.) (two-step inquiry: did prosecutor's misconduct prevent witness from giving relevant testimony and, if so, was fact finding process intentionally distorted by government), *cert. denied,* 531 U.S. 885, 121 S.Ct. 202, 148 L.Ed.2d 141 (2000); *Jeffers v. Ricketts,* 832 F.2d 476, 479–480 (9th Cir. 1987) (where no evidence of prosecutorial misconduct in refusing to grant immunity to defense witness, no denial of fair trial), *overruled on other grounds in Lewis v. Jeffers,* 497 U.S. 764, 110 S.Ct. 3092, 111 L.Ed.2d 606 (1990); *United States v. Agurs,* 427 U.S. 97, 103, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976) (where no prosecutorial misconduct, test for "materiality" of unavailable testimony is not applicable). *See also Johnson v. Sublett,* 63 F.3d 926, 929 (9th Cir.1995) (habeas relief on claim of prosecutorial misconduct limited to cases in which petitioner can establish that misconduct resulted in actual prejudice).

### a. *Facts of this case do not amount to misconduct.*

■ Based upon the foregoing authorities and a survey of the relevant law, this Court finds that there is no "clearly established Federal law" that would command a finding that under the particular facts of this case, the prosecutor committed "misconduct" warranting habeas relief.

■ Unlike cases where a prosecutor has directly coerced, threatened, or intimidated a witness into not testifying, or into invoking the witness's Fifth Amendment privilege against testifying, no such coercion, threats, or intimidation appear in this record. The prosecutor here had no apparent objection to Sheridan testifying for the defense, and Petitioner points to no clear and convincing evidence to prove otherwise. The prosecutor did not threaten Sheridan with a perjury prosecution if Sheridan testified for the defense. The prosecutor did not grant immunity to prosecution witnesses while withholding immunity from Sheridan. While Sheridan's plea agreement did apparently state that he would testify truthfully if called by the prosecution—assumedly in conformity with prior statements Sheridan had made to police and authorities, as a result of which the prosecutor proffered the plea bargain in the first place—such a "condition" does not represent undue coercion, threat, or intimidation. *See, e.g., United States v. Moody,* 778 F.2d 1380, 1384–1385 (9th Cir. 1985) (witness testimony provided pursuant to a plea agreement not involuntary or coerced); *Williams v. Woodford,* 384 F.3d 567, 594 (9th Cir.2004) (interrogating agent's suggestion that suspect's cooperation with government will have positive effect on suspect's possible sentence is not improper inducement causing testimony to be involuntary), *cert. denied,* 546 U.S. 934, 126 S.Ct. 419, 163 L.Ed.2d 319 (2005); *id.* at 602–603 (mere warning that witness could be prosecuted for perjury if witness testified falsely does not evidence threat or intimidation); *Jeffers v. Ricketts,* 832 F.2d at 479–480 (9th Cir.1987)(where prosecutor made no threats to witness, no prosecutorial misconduct). *Cf. United States v. Henricksen,* 564 F.2d 197, 198 (5th Cir. 1977) (plea bargain that required that if witness testified in any manner regarding defendant plea bargain would be void and

witness would be tried constituted prosecutorial misconduct; "substantial" government interference with witness's choice to testify violates due process).

 Likewise, this Court is aware of no Supreme Court authority that holds that a prosecutor's refusal to immunize a potential defense witness, in spite of the witness's assertion of the Fifth Amendment privilege, so that the defense can then call and directly examine the witness, constitutes prosecutorial misconduct. As the California Court of Appeal noted in *Woods,* the Sixth Amendment right to compulsory process is not absolute, and more than the mere absence of testimony is necessary to establish a violation of the right. *See United States v. Valenzuela–Bernal,* 458 U.S. at 867. ·*See also United States v. Brutzman,* 731 F.2d 1449, 1451–52 (9th Cir.1984) ("[i]t is well-settled that the Sixth Amendment does not provide[ ] a defendant with a right to demand use immunity for defense witnesses who invoke their privilege against self-incrimination"), *overruling on other grounds recognized by United States v. Booth,* 309 F.3d 566 (9th Cir.2002), Where a potential defense witness has asserted the Fifth Amendment privilege against self-incrimination, an accused is not entitled to compel a prosecutor to grant immunity to the potential defense witness to force him to testify. *United States v. Paris,* 827 F.2d at 399; *United States v. Alessio,* 528 F.2d at 1081–1082 (Fifth and Sixth Amendments do not confer on defendant power to demand immunity for co-defendants or other witnesses). The decision whether or not to grant immunity to a witness is peculiarly an executive decision, and no court has authority to immunize a witness. *See Pillsbury Co. v. Conboy,* 459 U.S. 248, 261, 103 S.Ct. 608, 74 L.Ed.2d 430 (1983) (case involving federal use immunity statute).

This Court is also aware of no Supreme Court case that holds that a prosecutor's refusal to consummate a plea bargain and agree to the sentencing of a defense witness, so that the witness can no longer invoke the Fifth Amendment, and can then be called to testify and directly examined by the defense, constitutes prosecutorial misconduct.

A recent, similar case from the Sixth Circuit on prosecutorial misconduct is instructive. The case of *Davis v. Straub,* 430 F.3d 281 (6th Cir.2006), *cert. denied,* 549 U.S. 1110, 127 S.Ct. 929, 166 L.Ed.2d 701 (2007), concerned two defendants, Davis and Bell, who were tried in a joint trial before separate juries in Michigan state courts for their involvement in the murders of a mother and her two children. Bell confessed, but Davis maintained his innocence. Davis attempted to call a witness, Jourdan, who Davis claimed was present during the mother's murder and who Davis expected would exculpate him. However, after Jourdan was called by the defense, a sidebar was held where the prosecutor and the judge, within earshot of the witness Jourdan, discussed the fact that Jourdan was also a suspect in the case, and that Jourdan should be informed of his Fifth Amendment rights before he testified. The judge then appointed counsel for Jourdan, and Jourdan eventually invoked the Fifth Amendment privilege against self-incrimination and refused to testify. The judge approved a "blanket" invocation of the privilege, without putting Jourdan on the stand to answer any individual questions. The trial continued without Jourdan's testimony, and both defendants Bell and Davis were convicted *See Davis v. Straub,* 430 F.3d at 284–285.

Davis filed a federal habeas petition which was denied; he appealed. A panel of Sixth Circuit judges found that the prosecutor in the case did not commit misconduct by ensuring that Jourdan was aware of his Fifth Amendment rights.

*Davis,* 430 F.3d at 287. Quoting *Webb v. Texas,* 409 U.S. at 98, 93 S.Ct. 351, the court in *Davis* found that the standard for undue prosecutorial intimidation was whether the prosecutor "exerted such duress on the witness' mind as to preclude him from making a free and voluntary choice whether or not to testify." *Davis,* 430 F.3d at 287. The Sixth Circuit then found that under *Webb* the prosecutor's conduct did not rise to an impermissible level of intimidation. *Id.* The Sixth Circuit stated that "[r]egardless of the prosecutor's motives or the propriety of waiting until the witness was called to the stand to inform the court of his concerns, we cannot say that the Michigan Court of Appeals unreasonably applied Supreme Court precedent in its holding that the prosecutor did not intimidate Jourdan into invoking the privilege." *Id.*

 The Ninth Circuit case of *United States v. Whitehead,* 200 F.3d 634 (9th Cir.) *cert. denied,* 531 U.S. 885, 121 S.Ct. 202, 148 L.Ed.2d 141 (2000), concerning a drug conviction in federal court, is also instructive. There, defendant Whitehead and his brother Jason attempted to enter the United States from Mexico with marijuana in their car. *Whitehead,* 200 F.3d at 636. During trial, Whitehead subpoenaed his brother to testify, but Jason invoked the Fifth Amendment. *Id.* at 637. Whitehead requested that the court order the government to grant use immunity to Jason. *Id.* The court refused to do so and eventually allowed Jason to claim the Fifth Amendment privilege. *Id.* The Ninth Circuit noted that " '[a] criminal defendant is not entitled to compel the government to grant immunity to a witness.' " *Id.* at 640 (*quoting United States v. Westerdahl,* 945 F.2d 1083, 1086 (9th Cir.1991)). The court then went on to state that a two-part inquiry was appropriate to determine if defendant Whitehead's Sixth Amendment rights had been violated: one, did the prosecutor commit misconduct that prevented Jason from giving relevant testimony by denying immunity to Jason, and two, if so, did such misconduct distort the judicial fact-finding process? *Whitehead,* 200 F.3d at 640. Ultimately, the Court found there was no misconduct because the prosecution did not take "affirmative steps" to prevent Jason from testifying, and the prosecution did not grant immunity to other witnesses while denying immunity to Jason. *Id.* The Ninth Circuit then stated that since there was no misconduct, an evidentiary hearing on the second step— that is, whether the government intentionally distorted the fact-finding process— was not warranted. *Id.* Accordingly, *Whitehead* can be read to affirm the proposition that a court must first determine if the prosecutor's actions amounted to misconduct, and thereafter analyze whether such misconduct "distorted" the fact-finding process.[5]

**5.** As discussed below, the Ninth Circuit in *United States v. Straub,* 538 F.3d 1147 (9th Cir.2008), an appeal from a federal court narcotics conviction, discussed, in a related federal law context, what might constitute "affirmative steps" sufficient to show prosecutorial misconduct. *See United States v. Straub,* 538 F.3d at 1157–1158. The Ninth Circuit noted that "affirmative steps" might include intimidating, harassing, or threatening a witness, and stated that "[t]he prosecution's conduct must amount to a substantial interference with the defense witness's free and unham-

pered determination to testify before the conduct violates the defendant's right to due process." *Id.* at 1158. Where a defense witness decides to invoke the Fifth Amendment on his own, such a scenario does not satisfy the requirement that the prosecution intentionally "caused" the witness to take the Fifth. *Id.* at 1158, n. 8 (*citing Williams v. Woodford,* 384 F.3d at 601). In that regard, the fact that Sheridan was represented by counsel throughout his invocation of the Fifth Amendment buttresses the finding that Sheridan's decision was "free and unhampered."

Based on the foregoing authorities, this Court finds that the prosecutor's actions in this case did not amount to the affirmative or coercive behavior that constitutes "misconduct."

Petitioner cites to several cases in an attempt to cobble together authority that would control in this habeas context, such as: *Webb v. Texas*, 409 U.S. 95, 93 S.Ct. 351, 34 L.Ed.2d 330 (1972); *United States v. Valenzuela–Bernal*, 458 U.S. 858, 102 S.Ct. 3440, 73 L.Ed.2d 1193 (1982); *Williams v. Woodford*, 384 F.3d 567 (9th Cir.2004); *United States v. Whitehead*, 200 F.3d 634 (9th Cir.2000): *United States v. Vavages*, 151 F.3d 1185 (9th Cir.1998); *United States v. Lord*, 711 F.2d 887 (9th Cir.1983); and *United States v. Morrison*, 535 F.2d 223 (3d Cir.1976). However, none of these cases, either individually or collectively, command a finding that habeas relief is warranted based on the prosecutor's actions in this case.

The Ninth Circuit has cited *Webb* for the proposition that "[u]necessarily strong admonitions against perjury aimed at discouraging defense witnesses from testifying have been held to deprive a criminal defendant of his Sixth Amendment right to compulsory process for obtaining witnesses in his favor." *United States v. Vavages*, 151 F.3d at 1188–1189. In *Vavages*, the Ninth Circuit further found that prosecutors are also bound by the holding in *Webb* regarding coercive or intimidating perjury admonitions. *See United States v. Vavages*, 151 F.3d at 1189–1190 (perjury warnings are not improper *per se*; defendant's rights violated by "deliberate and badgering threats designed to quash significant testimony") (citations omitted). However, the facts of this case are not controlled by either *Webb* or *Vavages*, since there is no evidence of any perjury admonitions, much less "deliberate and badgering" threats to Sheridan by the prosecutor.

Petitioner's reliance on *United States v. Valenzuela–Bernal* is also unavailing, *Valenzuela–Bernal* is factually distinguishable because it is a federal court drug case and concerned illegal aliens who were arrested by Border Patrol agents. *See Valenzuela–Bernal*, 458 U.S. at 860–861, 102 S.Ct. 3440. There, the defendant claimed that his Fifth Amendment due process rights and his Sixth Amendment right to compulsory process were violated when an Assistant United States Attorney concluded that two potential witnesses had no material evidence and the two witnesses were deported to Mexico before the defendant's trial. *Id.* at 861, 102 S.Ct. 3440. The Supreme Court found no violation of the Fifth or Sixth Amendment because the defendant made no showing that the deported witnesses' testimony was relevant and material and vital to the defense. *Id.* at 867, 102 S.Ct. 3440. The Supreme Court also noted that in that case the government was charged with the "dual responsibility" of apprehending persons who violate the law and of promptly deporting illegal aliens. *Id.* at 864, 102 S.Ct. 3440. The Supreme Court then went on to state that "[s]anctions may be imposed on the Government for deporting witnesses only if the criminal defendant makes a plausible showing that the testimony of the deported witnesses would have been material and favorable to his defense, in ways not merely cumulative to the testimony of available witnesses." *Id.* at 873, 102 S.Ct. 3440. Finally, the Supreme Court noted that "[i]n adopting this standard, we express no opinion on the showing which a criminal defendant must make in order to obtain compulsory process for securing the attendance at his criminal trial of witnesses within the United States." *Id.* at 873, fn. 9, 102 S.Ct. 3440 (emphasis added).

Thus, *Valenzuela–Bernal* is not controlling in this case. *Valenzuela–Bernal* concerns deported aliens who were completely

unavailable, not a witness whose unavailability was due to invocation of the Fifth Amendment privilege; further, the government arguably had control over the availability of the witnesses in *Valenzuela–Bernal* if it had decided not to deport them, contrasting with this case, where the prosecutor did not improperly influence Sheridan's decision to take the Fifth. Importantly, the Supreme Court in *Valenzuela–Bernal* explicitly stated that the case does not necessarily apply where a defendant is seeking the testimony of a witness within the United States. *Id.* at 873, fn. 9, 102 S.Ct. 3440. For all of these reasons, *Valenzuela–Bernal* does not supply a holding which commands this court to find that the California state courts' denial of this claim was contrary to, or an unreasonable application of, controlling Supreme Court precedent. *See Kane v. Espitia*, 546 U.S. at 9, 126 S.Ct. 407 (no federal habeas relief where no Supreme Court holding on claimed right); *Mitchell v. Esparza*, 540 U.S. at 17, 124 S.Ct. 7 (no habeas relief based on ambiguous Supreme Court authority); *Carey v. Musladin*, 549 U.S. at 76–77, 127 S.Ct. 649 (no habeas relief where issue is "open question" in Supreme Court jurisprudence).[6]

In *Williams v. Woodford*, a § 2254 habeas case, petitioner Williams sought relief from a capital murder conviction and claimed, among other things, that four witnesses who Williams claimed would have testified favorably in his defense refused to do so because the prosecution refused to grant the witnesses use immunity. *Williams*, 384 F.3d at 599. The Ninth Circuit, citing Ninth Circuit cases only, stated that "the prosecution's refusal to grant use immunity to a defense witness denies the defendant a fair trial only when (1) the witness's testimony would have been relevant, and (2) the prosecution refused to grant the witness use immunity with the deliberate intention of distorting the fact-finding process." *Williams*, 384 F.3d at 600 (*citing United States v. Westerdahl*, 945 F.2d at 1086 and *United States v. Lord*, 711 F.2d at 891). Assuming that defendant Williams satisfied the "minimal requirement" that his unavailable witnesses' testimony would have been relevant to his Sixth Amendment claim, the Court then turned to the "second prong"

---

**6.** In particular, Petitioner's arguments that *Valenzuela–Bernal* warrants a "relaxation" of the "materiality" requirement in this case are unavailing. Specifically, petitioner argues that "the state's test conflates the criteria set forth in *Webb* with those set forth in *Valenzuela–Bernal* by requiring a defendant to show both prosecutorial [misconduct] and materiality under *Valenzuela–Bernal* ... [but] the state's test fails to recognize that substantial interference with a defense witness constitutes an actionable constitutional violation even where the prosecution acts for a wholly legitimate purpose, so long as other conditions set forth in *Valenzuela–Bernal* are satisfied." (Traverse 10.)

The Supreme Court in *Valenzuela–Bernal* mentioned, in dicta, that since the defendant had no access to the deported witnesses before their deportation, such a circumstance "may well support a relaxation of the specificity required in showing materiality"; but the

Supreme Court still noted that such a "relaxation" did not wholly dispense with the required "materiality" showing and stated that the defendant still had to demonstrate "the events to which a witness might testify." *See Valenzuela–Bernal*, 458 U.S. at 870–871, 102 S.Ct. 3440. However, Petitioner seems to cite these statements in support of an argument that only a slight showing of materiality is required, *and no showing of prosecutorial misconduct is required*, when a witness is completely unavailable to the defense before or during the trial. (*See, e.g.,* FAP Mem 20.) This Court does not construe the controlling Supreme Court authorities to dispense with the predicate showing of prosecutorial misconduct that in some way resulted in the unavailability of the witness. *See, e.g., United States v. Agurs*, 427 U.S. at 103, 96 S.Ct. 2392 (where no prosecutorial misconduct, test for "materiality" of unavailable testimony is not applicable).

of its inquiry, and asked "whether the prosecution took affirmative steps to prevent Williams's witnesses from testifying," and stated that it would rely upon the California Supreme Court's factual findings on the matter. *Id.* at 601. The California Supreme Court had found that, of the four witnesses Williams wanted to call, one was himself indicted a week before he was called to testify for Williams, another feared he was soon to be indicted himself and two of them refused to testify because they feared Williams and felt intimidated by Williams and his counsel. *Id.* at 601, The Court then found there was no prosecutorial misconduct, stating that "the prosecution does not abuse its discretion when it refuses to grant use immunity to a defense witness who has been indicted or is the subject of a criminal investigation," and also stating that the prosecution did not threaten any perjury prosecutions for any of the witnesses, *Id.* at 602. Thus, *Williams* supports the finding in this case that, based on the trial record, the prosecutor did not unduly threaten or intimidate Sheridan and thus there was no misconduct. *See United States v. Straub*, 538 F.3d at 1157–1158 (citing *Williams* for the proposition that a prosecutor must take "affirmative steps" amounting to "prosecutorial misconduct" to justify grant of use immunity under federal statutes).

Likewise, in *United States v. Lord*, a direct appeal from federal convictions in United States District Court on cocaine and weapons charges, the Ninth Circuit stated that the issue was whether the prosecutor had "deliberately caused" a witness to invoke the Fifth Amendment and refuse to testify, and whether the prosecutor had improperly refused to grant defense witnesses use immunity under 18 U.S.C. §§ 6002–6003. *See United States v. Lord*, 711 F.2d at 889–892. The Ninth Circuit remanded to the district court for an evidentiary hearing on whether there was prosecutorial misconduct. *Id.* at 892–

893. *Lord* is unavailing in this habeas context since it did not cite or discuss *any* United States Supreme Court cases or authority. Accordingly, based on the lack of Supreme Court precedent that would control in this habeas context, *Lord* cannot establish that the California courts' denial of this claim was contrary to, or an unreasonable application of, relevant Supreme Court precedent.

Petitioner's citation to *United States v. Morrison*, 535 F.2d at 229 (3d Cir.1976) is also unavailing, since *Morrison* concerned a prosecutor's repeated statements to a defense witness about the dangers of perjury and self-incrimination, and about the witness's right not to testify, culminating in a highly intimidating personal interview. *Morrison*, 535 F.2d at 229. Thus, *Morrison* is factually distinguishable; and *Morrison*, and the other out-of-circuit, non-Supreme Court cases cited by Petitioner, are not controlling in this habeas context. *See* 28 U.S.C. § 2254(d)(1).

The facts of this claim concern the complicated interplay between a prosecutor's legal and ethical duties, a witness's right to invoke the Fifth Amendment, and a defendant's rights to present a defense and compel testimony. However, the lack of Supreme Court holdings commanding a definite outcome in this case militates against finding that the grant of the writ is warranted by any alleged prosecutorial "misconduct" based on the facts at issue here. *See, e.g., Davis v. Straub*, 430 F.3d at 287–288 (6th Cir.2005) (Supreme Court holdings do not clearly establish how to resolve conflict between witness's Fifth Amendment privilege and defendant's Sixth Amendment right to present a defense) (*citing Hoffman v. United States*, 341 U.S. 479, 71 S.Ct. 814, 95 L.Ed. 1118 (1951) and *Washington v. Texas*, 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967)). This Court is aware of no Supreme Court

authority that directly holds that the prosecutor's actions in this case amount to misconduct; and in the absence of such Supreme Court authority, the state court's denial of this claim cannot warrant habeas relief. *See Kane v. Espitia*, 546 U.S. at 9, 126 S.Ct. 407 (no federal habeas relief where no Supreme Court holding on claimed right); *Mitchell v. Esparza*, 540 U.S. at 17, 124 S.Ct. 7 (no habeas relief where Supreme Court authority is ambiguous).[7]

### b. *Prejudice analysis*

 Even assuming, *arguendo*, that the prosecutor committed misconduct, under federal law Petitioner must still show that the misconduct rendered the trial fundamentally unfair, resulting in actual prejudice to Petitioner. *See Darden*, 477 U.S. at 181, 106 S.Ct. 2464; *Johnson v. Sublett*, 63 F.3d at 929.

### 1. *Factual background, Petitioner's offer of proof*

As noted above, the trial judge asked Petitioner's counsel if the defense could use Sheridan's prior out-of-court statements to impeach Amos, and Petitioner's counsel replied that they could. (RT 603–604.) The judge then considered fashioning an evidentiary remedy to admit Sheridan's statements at trial in lieu of Sheridan's live testimony. (RT 604–608.)

At a subsequent hearing, the trial judge noted that he had received briefing from Petitioner's counsel on these issues, together with a sealed offer of proof as to

the testimony that the defense expected Sheridan would have testified to. (RT 615.) Petitioner's counsel stated that the offer of proof was based upon "15,000 plus pages of discovery and information" contained in reports documenting prior statements Sheridan made to police investigators and the district attorney, and in other statements Sheridan made to third parties as well. (RT 620–621.) This Court's review of the record reveals that the offer of proof stated, among other things, that Sheridan could directly provide "critical" testimony on over twenty different issues, and could impeach Amos on at least five grounds: (1) the amount of money Amos claims Sheridan was to be paid for the murder; (2) the date on which Amos first approached Sheridan to commit the murder; (3) when Amos gave Sheridan the money for the murder; (4) whether Amos knew Sheridan was going to commit the murder on the night of the murder; and (5) when Amos learned of McKenna's death. (*See* CT 569–573.) The offer of proof also stated that "[o]ther prosecution witnesses, such as George Sensenbach and Robert Berg, will also state that just before his murder McKenna was talking about getting rid of Dave Amos from the clubs." (CT 571, n. 1.)

At the hearing before the trial judge, Petitioner's counsel acknowledged that at least some of those third parties whom Sheridan spoke to were still available to the defense as witnesses. (RT 621.) The trial judge then asked Petitioner's counsel

---

7. Since this Court finds that the prosecution's actions in this case cannot be classified as misconduct under the relevant controlling law, this Court does not find it necessary to consider Petitioner's argument that the state courts made an unreasonable factual determination concerning the prosecutor's motives or intent in performing these actions. *Cf. Woods* at 937, 16 Cal.Rptr.3d 174. Likewise, this Court does not find it necessary to consider Petitioner's argument that the state courts

found that the prosecutor's actions were "coercive," since, under controlling Federal law, the prosecutor's actions here cannot be legally characterized as such. This Court also notes that the California Court of Appeal did not expressly find the prosecutor's actions here "coercive," as Petitioner characterizes them; but only stated that it found that "the prosecutor's actions were a substantial cause in keeping Sheridan off the stand." *Woods* at 937–937, 16 Cal.Rptr.3d 174.

"[s]o for all the statements or for all of the evidence you would seek to introduce in this offer of proof, you have other means to get them in, other than Mr. Sheridan's testimony?" (RT 622.) The trial judge then clarified the question by asking if, notwithstanding hearsay objections to such statements, the defense had the witnesses available who could testify that Sheridan made the statements to them. (RT 623.) The trial judge said "[w]hat I'm saying is wouldn't those statements be available to you as evidence because the person, whoever is the person who received that statement, can come in and say Sheridan told me this?" (RT 623.) Petitioner's counsel then said "[t]heoretically, if we could do it that way, yes ... yes, we could theoretically." (RT 623.) The trial judge then stated "it [ ] appears that the substance of [Sheridan's] statements are available to the defense," and Petitioner's counsel said "yes." (RT 626.) The court then asked "[h]ow critical is it that it [*i.e.,* Sheridan's statements] come in through Mr. Sheridan testifying, as opposed to coming in through another source?" (RT 626.) The trial court then stated "there is no defense right to have the people call someone as a witness," and Petitioner's counsel stated "we don't quarrel with that." (RT 626.)

The trial judge then asked "Isn't all of that material that you are going to be able to get into evidence anyway?" and Petitioner's counsel said "I guess." (RT 651–652.)

Petitioner's counsel stated that if Sheridan's out-of-court statements were going to come in, the jury would need instruction as to how to treat the statements. (RT 677.) The trial judge then said "there would not be a limiting instruction during the course of the trial that [the statements] would only be for impeachment ... I'm not going to limit the defense use." (RT 678.) The trial judge said "what the defense is raising is that the defense is

using these statements because they do not have the ability to call this person as a witness." (RT 680.) Petitioner's counsel then stated that there was nothing more they had to add to their offer of proof regarding Sheridan's testimony at that time "other than what we've already raised and filed." (RT 680–681.)

### 2. *Court of Appeal's prejudice analysis*

In denying this claim, the California Court of Appeal stated that it recognized that Petitioner was denied the opportunity to examine Sheridan on the witness stand and use Sheridan's "live" testimony to undermine the prosecution's case. *Woods* at 938, 16 Cal.Rptr.3d 174. However, the Court of Appeal stated that the right to present a defense, and the right to compulsory process, are not unqualified; and those rights did not entitle Petitioner to compel Sheridan to waive his Fifth Amendment privilege. *Id.* (citing *Buie v. Sullivan,* 923 F.2d 10, 11 (2d Cir.1990) and *United States v. Moore,* 682 F.2d at 856).

The Court of Appeal then conducted its own prejudice analysis. *See Woods* at 937–938, 16 Cal.Rptr.3d 174. The Court of Appeal noted—in light of the fact that the trial judge relaxed the hearsay rules, allowing out-of-court statement made by Sheridan to be introduced at trial, and instructing the jury that they could consider those statements for the truth of the matters asserted therein—that Petitioner "took full advantage" of the opportunity presented by the trial judge's relaxation of the evidentiary rules. *Id.* at 937–938, 16 Cal.Rptr.3d 174.

In denying this claim, the Court of Appeal cited three federal cases in particular: *United States v. Valenzuela–Bernal,* 458 U.S. 858, 102 S.Ct. 3440, 73 L.Ed.2d 1193 (1982); *Buie v. Sullivan,* 923 F.2d 10 (2d Cir.1990); and *United States v. Capozzi,* 883 F.2d 608 (8th Cir.1989). *See Woods* at 937–938, 16 Cal.Rptr.3d 174. The Court of

Appeal cited *Valenzuela–Bernal* for the proposition that Sheridan's live testimony was not a "material" component of Petitioner's defense, since Petitioner was allowed to use Sheridan's statements in lieu of the live testimony. *Woods* at 937, 16 Cal.Rptr.3d 174. The Court of Appeal cited *Buie* for the proposition that where "comparable" exculpatory statements and evidence were admitted through other witnesses, no constitutional violation occurred. *Woods* at 937–938, 16 Cal.Rptr.3d 174 (*citing Buie*, 923 F.2d at 12). The Court of Appeal cited *Capozzi* for the proposition that where the defendant was allowed to introduce prior testimony in lieu of live testimony, thus allowing the defendant "to present his version of the facts to the jury," there was no violation of the defendant's right to compulsory process. *Woods* at 938, 16 Cal.Rptr.3d 174 (*citing Capozzi*, 883 F.2d at 615).

The Court of Appeal noted that Petitioner elicited Sheridan's statements from various witnesses, and also confronted many witnesses with statements attributed to Sheridan. *Woods* at 938, 16 Cal. Rptr.3d 174. The Court of Appeal found that these statements "effectively allowed for the impeachment of Amos and also provided evidence Sheridan and Amos wanted to kill McKenna for their own reasons." *Id.* The Court of Appeal also noted that Petitioner could not delineate any further testimony, over and above what was presented to the jury, that Petitioner was precluded from introducing at trial. *Id.* The Court of Appeal then stated that "[f]rom this, we may logically conclude [Petitioner] was allowed to present his version of the facts to the jury and that is all the constitution requires." *Id.*

### 3. *Review of the record, discussion.*

This Court's own review of the record reveals that the Court of Appeal's finding that Petitioner suffered no prejudice is entitled to deference.

█ First, this Court finds that the Court of Appeal properly relied on the cases of *Buie v. Sullivan* and *United States v. Capozzi* for the proposition that introduction of statements of unavailable witnesses in lieu of live testimony may satisfy a defendant's Sixth Amendment rights. The cases themselves are instructive.

In *Buie*, police had arrested an important, exculpatory defense witness and charged him with a crime just days before defendant Buie's trial. *Buie*, 923 F.2d at 11. The arrestee then claimed the Fifth Amendment privilege and refused to testify at Buie's trial. *Id.* Buie conceded that there was probable cause for the arrest, but he argued that the arrest constituted prosecutorial misconduct because it was motivated by the prosecutor's bad faith desire to interfere with the witness's testimony and violated Buie's Sixth Amendment right to present a defense. *Id.* However, at trial, a police officer testified about the exculpatory statements made by the unavailable witness—statements which the Second Circuit noted were not subject to cross-examination since the witness was not present. *Id.* at 12. The Second Circuit characterized Buie's claim as "a violation of the right to present a defense based on lost evidence," and stated that to prevail Buie had to show that the "lost evidence" was material and exculpatory and "of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." The Second Circuit then went on to find that since Buie was able to introduce "comparable evidence" through the testimony of the police officer, there was no constitutional Sixth Amendment violation. *Id.* at 12 (*citing United States v. Capozzi*, 883 F.2d at 614–615.)

In *Capozzi*, the government refused to grant statutory immunity to certain wit-

nesses, and the witnesses then invoked the Fifth Amendment. *United States v. Capozzi,* 883 F.2d 608, 612 (8th Cir.1989), *cert. denied,* 495 U.S. 918, 110 S.Ct. 1947, 109 L.Ed.2d 310 (1990). Defendant Capozzi argued that the government's refusal to grant immunity deprived him of exculpatory testimony which would otherwise have been available to him. *Id.* The Eighth Circuit found no violation of defendant's Sixth Amendment right to compulsory process because defendant did not establish an absence of material testimony that was favorable to the defense. *Id.* at 614–615. Where the defense was permitted to present earlier, sworn testimony from the missing witnesses, and where defendant did not make a showing of evidence over and above what was presented to the jury, the Eighth Circuit found no violation of the defendant's right to compulsory process. *Id.* at 615.

In the third federal case cited by the Court of Appeal, *Valenzuela–Bernal,* the Supreme Court indicated, in a different but somewhat related context, that no sanctions would be awarded against the government where two witness were deported unless the defendant could show that the absent witnesses' testimony was material and favorable and "not merely cumulative to the testimony of available witnesses." *See Valenzuela–Bernal,* 458 U.S. at 873, 102 S.Ct. 3440.

■ Taken together, this Court finds that the California Court of Appeal's opinion that under certain circumstances introduction of a witness's statements in lieu of the witness's live testimony does not offend the Sixth Amendment is correct. *See, e.g., Chambers v. Mississippi,* 410 U.S. at 295, 93 S.Ct. 1038 (Sixth Amendment right to call and examine witnesses not absolute and may bow to accommodate other legitimate interests in criminal trial process). While, in this case, it is Sheridan's missing testimony that is "cumula-

tive" to his own introduced statements, the rule would seem to be that when missing testimony is cumulative to testimony that was introduced at trial, a constitutional violation is less likely. *See Valenzuela–Bernal,* 458 U.S. at 873, 102 S.Ct. 3440 (no violation of Sixth Amendment where live testimony would merely be cumulative).

This Court also notes that Petitioner does not effectively refute the Court of Appeal's finding that "nearly every statement in [Petitioner's] four-page [offer of proof] was either introduced into evidence or used by [Petitioner's] attorneys in their examination of witnesses." *Woods* at 938, 16 Cal.Rptr.3d 174 (bracketed material added). This Court's own review of the record reveals that the Court of Appeal's finding on this point is again entitled to deference. In particular, Petitioner's counsel cross-examined Amos vigorously, and relied on statements from Sheridan extensively. (*See, e.g.,* RT 1283–1375.) The two witnesses whom Petitioner claimed in the offer of proof would also exculpate Petitioner—George Sensenbach and Robert Berg—testified and were cross-examined by Petitioner. (*See* RT 1124–1132, 1137–1138 [Berg]; RT 1395–1422 [Sensenbach].) Petitioner claims that he can not make an adequate offer of proof showing what further, unknown material testimony was lost due to Sheridan's unavailability because Sheridan did not take the stand; however, the evidence that Petitioner cites in the offer of proof is extensive, and the fact that Petitioner got most, if not all, of it in ameliorates any finding of prejudice.

■ Furthermore, in light of all of the evidence in the record inculpating Petitioner, the Court is convinced that Petitioner suffered no prejudice from the absence of Sheridan's live testimony, First and foremost, the tape of the conversation between Amos and Petitioner at Jerry's Famous

Deli speaks for itself, and its implications are damning. (*See* CT 457–482; RT 1280.) Among other things, Amos asks what Petitioner would do if Amos "takes the fall" for Petitioner (CT 461); Petitioner admits stealing from Amos (CT 461); Amos tells Petitioner that, unbeknownst to Amos, Sheridan had a driver "when he went down to do MAC" [McKenna] (CT 463); Petitioner implies that he gave Amos an interest in the strip clubs as a reward (CT 464); Petitioner counsels Amos not to give any "more money" to Sheridan (CT 466); Petitioner seems to inquire whether Sheridan knows Petitioner was involved in the hit on McKenna (CT 467); Petitioner does not respond when Amos tells him that Sheridan knows Petitioner was behind the money to kill McKenna because Amos doesn't have that kind of money (CT 467); Petitioner tells Amos "I was always under the impression that [Sheridan] didn't know that it came past you" (CT 468); Petitioner states that Amos told Petitioner that Amos would "take care of" Sheridan (CT 469); Petitioner states that if the authorities are "still doing the tax evasion that means they don't have shit on the other thing" (CT 471); Petitioner tells Amos that Amos has to "stall" Sheridan (CT 472); Petitioner suggests that they should talk about Sheridan "outside" (CT 474); Petitioner tells Amos that if Amos gets arrested Petitioner will have "the business" pay Amos's legal expenses (CT 476); Petitioner asks Amos "you don't know who [Sheridan's] driver was?" (CT 476); Petitioner states "[t]he only thing that bothers me is there's a driver. That's what bothers me" (CT 477); Petitioner asks Amos "[t]he other piece of equipment, did it get thrown away? I mean this evidence . . . the weapon . . . that was used." (CT 477); Amos tells Petitioner that Sheridan threw the weapon away (CT 478); and Petitioner tells Amos to convince Sheridan not to talk to the authorities (CT 478).

Petitioner's counsel cross-examined Amos extensively after this tape was played for the jury. (*See, e.g.,* RT 1283–1375.)

The jury also heard testimony that Petitioner offered David Smith $30,000 to kill McKenna. (RT 1146.) Stephen Bach testified that Smith told him that Petitioner wanted McKenna "taken out." (RT 1224.)

Petitioner himself eventually took the stand and testified at extensively to try and state his case and refute the inculpatory evidence against him. (*See* RT 1592–1841; 1878–1879.)

The trial judge instructed the jury that: "[t]he defense has introduced prior statements made by John Sheridan. Such statements may be considered by you for the truth of the facts asserted in such statements. It is for you to determine whether the facts set forth in any such statements are true and what weight and significance to attach to such statements." (RT 2036.) The trial judge also instructed the jury that: "[n]either side is required to call as witnesses ail persons who may have been present at any of the events disclosed by the evidence or who may appear to have some knowledge of these events." (RT 2035.)

In light of all of the foregoing, this Court finds that Petitioner was not prejudiced by the inability to call Sheridan to the stand for live testimony. Undoubtedly the trial court fashioned a novel remedy in this case to compensate for the absence of Sheridan's live testimony. However, given the extensive evidence of Petitioner's guilt; the numerous statements made by Sheridan that were admitted at trial; the fact that Sheridan's live testimony would have been cumulative, at least in part, to Sheridan's admitted statements; the trial courts instructions allowing the jury to consider Sheridan's admitted statements for the truth of the matters asserted therein; and

the fact that both Amos and Petitioner testified at length, it cannot be said that the absence of Sheridan's live testimony had a substantial and injurious effect or influence in determining the jury's verdict. Since Petitioner suffered no actual prejudice, habeas relief is not warranted on this claim.[8]

## B. Ground Two: Trial Court's Fifth Amendment Privilege Ruling.

Petitioner's second ground for relief argues that the trial court's ruling that Sheridan was entitled to claim the Fifth Amendment privilege against self-incrimination violated Petitioner's Fifth and Sixth Amendment rights to due process and to present a defense, since Petitioner claims that Sheridan only wanted to consummate his plea bargain and had no reasonable belief that his answers at trial would incriminate him. (*See* FAP 1–2, FAP Mem 19 *et seq.*) Petitioner argues that by agreeing under the terms of his proposed plea agreement to testify if called by the prosecution, Sheridan waived the privilege that he eventually invoked when faced with the prospect of being called directly by the defense; thus, the trial court's acceptance of Sheridan's invocation of the Fifth Amendment privilege was error. (*See* FAP Mem 27:5–10.)

Petitioner also complains about the manner in which the trial judge received and approved Petitioner's invocation of the Fifth Amendment privilege, arguing that "both the trial court and the appellate court believed Sheridan was entitled to the Fifth Amendment privilege merely by claiming it." (FAP Mem 27.) Petitioner argues that "Sheridan's unexplained, blanket assertion of the privilege should have been disallowed." (FAP Mem 30), *citing United States v. Vavages*, 151 F.3d 1185, 1192 (9th Cir.1998).

Petitioner also apparently argues that the trial judge had "authority to limit the scope of Sheridan's testimony by accommodating Petitioner's Sixth Amendment rights with the protection extended Sheridan under the Fifth Amendment," citing out-of-circuit federal cases which arguably allow a trial judge to limit the scope of direct examination and allow witnesses to invoke the Fifth Amendment during cross-examination. (*See* FAP Mem 28:4–9 *citing United States v. Gary*, 74 F.3d 304, 310 (1st Cir.1996) and *United States v. De La Cruz*, 996 F.2d 1307, 1313 (1st Cir.1993)).

Petitioner also argues that he was prejudiced, within the meaning of *Brecht v. Abrahamson*, 507 U.S. 619, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993), by the trial court's improper granting of the Fifth Amendment privilege because the ruling deprived Petitioner of access to Sheridan before trial, and deprived Petitioner of material, exculpatory testimony from Sheridan at trial. (FAP Mem 30.)

### 1. *State court ruling on trial judge's allowance of Fifth Amendment plea*

The California Court of Appeal's opinion in *Woods* is the last reasoned state court decision on this claim, and so this Court analyzes the *Woods* opinion to determine if the state courts' denial of this claim was contrary to, or involved an unreasonable application of, clearly established Federal law. *See* 28 U.S.C. § 2254(a)(1); *Davis v. Grigas*, 443 F.3d at 1158.

---

**8.** This Court notes that Petitioner, in response to an Order to Show Cause issued by this Court, has expressly waived any claim that his rights under the Sixth Amendment Confrontation Clause, or under *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), were violated by the introduction of Sheridan's out-of-court statements. Accordingly, this Court does not consider any such claim, or the possible interplay between *Buie*, *Capozzi*, *Valenzuela–Bernal*, and *Crawford*.

In denying this claim, the Court of Appeal noted that during the pretrial hearing, the prosecutor stated that:

[T]here's also other crimes [Sheridan has] been accused of by defense representatives which they will want to get into, such as being a felon with a firearm or using drugs or being engaged in other murders. So it is not simply the issue of this murder. There's a whole host of crimes that the defense will want to get into and doors they'll want to open.

*Woods* at 939, 16 Cal.Rptr.3d 174. (*See* RT 657–658.) The Court of Appeal then stated that because Sheridan's plea agreement did not provide him sanctuary from these crimes, Sheridan was entitled to invoke his right against self-incrimination. *Id.* (*citing United States v. Pierce,* 561 F.2d 735, 738 (9th Cir.1977) and *United States v. Johnson,* 488 F.2d 1206, 1209–10 (1st Cir.1973)).

The Court of Appeal also denied Petitioner's claim that because Sheridan had accepted the prosecution's plea bargain, under whose terms Sheridan agreed to testify for the prosecution, Sheridan had waived his Fifth Amendment privilege. *Woods* at 938–939, 16 Cal.Rptr.3d 174. The Court of Appeal noted that "[a]lthough Sheridan obviously wanted to accept the plea bargain, that deal had not been struck." The Court of Appeal then found that "[a]s an unconvicted, unsentenced defendant, Sheridan retained his Fifth Amendment rights with respect to the offenses alluded to in the proposed plea agreement." *Woods* at 938, 16 Cal. Rptr.3d 174 (*citing, inter alia, United States v. Paris,* 827 F.2d at 399; *Taylor v. Best,* 746 F.2d 220, 222 (4th Cir.1984); and *Mills v. United States* 281 F.2d 736, 741 (4th Cir.1960)).

Based on the foregoing, the Court of Appeal held that the trial court properly found that Sheridan did not waive his Fifth Amendment rights by agreeing to plead guilty under the government's proposed plea agreement, and the trial court properly determined that Sheridan's unavailability did not deprive Petitioner of his rights to due process or to present a defense. *Woods* at 939, 16 Cal.Rptr.3d 174.

2. *Legal standards regarding grant of Fifth Amendment privilege.*

■ As noted, the Supreme Court has stated that the Fifth Amendment's provision against self-incrimination "must be accorded liberal construction in favor of the right it was intended to secure." *Hoffman v. United States,* 341 U.S. at 486–487, 71 S.Ct. 814 (citations omitted). It is not necessary that a person be guilty of criminal misconduct to invoke the privilege; the privilege also protects the innocent person "who otherwise might be ensnared by ambiguous circumstances." *Baxter v. Palmigiano,* 425 U.S. 308, 327, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976) (citation and internal quotation marks omitted).

However, the Supreme Court has also stated that "this protection must be confined to instances where the witness has reasonable cause to apprehend danger from a direct answer." *Hoffman,* 341 U.S. at 487, 71 S.Ct. 814 (citations omitted). The Supreme Court in *Hoffman* has explained the procedural mechanisms surrounding invocation of the privilege as follows:

The witness is not exonerated from answering merely because he declares that in so doing he would incriminate himself—his say-so does not of itself establish the hazard of incrimination. It is for the court to say whether his silence is justified [citation omitted] and to require him to answer if it clearly appears to the court that he is mistaken. [Citation omitted.] However, if the witness, upon interposing his claim, were

required to prove the hazard in the sense in which a claim is usually required to be established in court, he would be compelled to surrender the very protection which the privilege is designed to guarantee. To sustain the privilege, it need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result. The trial judge in appraising the claim must be governed as much by his personal perception of the peculiarities of the case as by the facts actually in evidence. [Citation omitted.]

*Hoffman v. U.S.*, 341 U.S. at 486–487, 71 S.Ct. 814 (internal quotations marks omitted).

In applying these standards, the Supreme Court has stated that where it is not "perfectly clear" to the trial judge, from a careful consideration of all the circumstances in the case, that the witness is mistaken as to the possibility that the witness's testimony would incriminate the witness or forge links in a chain of facts imperiling the witness with conviction for a crime, the privilege should be upheld. *See Malloy v. Hogan*, 378 U.S. 1, 12, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964) (*citing Hoffman*, 341 U.S. at 499–490, 71 S.Ct. 814). *See also, e.g., United States v. Johnson*, 488 F.2d 1206, 1209 (1st Cir.1973) (drug conviction in federal district court; trial judge may appraise claim of privilege in light of his personal perception of peculiarities of case and should not be overruled unless perfectly clear that witness is mistaken in invoking privilege) (*quoting Hoffman v. United States*, 341 U.S. at 487–488, 71 S.Ct. 814).

The Ninth Circuit has stated that "[a] court's duty to scrutinize a witness' invocation of the Fifth Amendment is particular-

ly weighty where . . . the witness makes a blanket assertion of the privilege." *United States v. Vavages*, 151 F.3d at 1192 (*citing United States v. Goodwin*, 625 F.2d 693, 701 (5th Cir.1980)). However, the Supreme Court has never explicitly held that a trial judge may not accept a witness's "blanket invocation" of the Fifth Amendment privilege without first subjecting the witness to particular questions. *See, e.g., Davis v. Straub*, 430 F.3d at 287 (no habeas relief based on trial judge's acceptance of blanket invocation of Fifth Amendment because Supreme Court has never held that permitting a witness to invoke Fifth Amendment without taking stand violates defendant's right to a fair trial). While Ninth Circuit authority is somewhat split on the issue, a recent case has also found that the Supreme Court has not commanded that the Fifth Amendment privilege must be invoked on the stand. *See Arredondo v. Ortiz*, 365 F.3d 778, 782 (9th Cir.) (*Hoffman* does not hold that privilege must be invoked on question-by-question basis; *Hoffman* says nothing about whether trial court may refuse to order witness to testify after invoking privilege as to prior convictions and pending charges), *cert. denied*, 543 U.S. 892, 125 S.Ct. 102, 160 L.Ed.2d 156 (2004). *Cf. United States v. Bodwell*, 66 F.3d 1000, 1001 (9th Cir.1995) (only way Fifth Amendment can be asserted as to testimony is on a question-by-question basis); *United States v. Pierce*, 561 F.2d 735, 741 (9th Cir.1977) (blanket refusal to answer any question unacceptable in federal district court case concerning defendant who failed to comply with terms of probation and invoked Fifth Amendment rather than reveal certain financial information); *United States v. Moore*, 682 F.2d at 856 (9th Cir.1982) (district court case; in civil case, exception to *Pierce* rule applies where "trial judge has special or extensive knowledge of the case that allows evaluation of

the claimed Fifth Amendment privilege even in the absence of specific questions to the witness") (*citing United States v. Tsui,* 646 F.2d 365, 367–368 (9th Cir.1981)); *United States v. Tsui,* 646 F.2d at 367 (9th Cir.1981) (district court case; "blanket refusal to answer any question is unacceptable"; but noting exception to general rule in *Pierce* where trial court was in a position to say that any response to all possible questions would tend to incriminate witness).

■■■ Furthermore, as noted, an unsentenced defendant retains his Fifth Amendment rights. *United States v. Paris,* 827 F.2d at 399. An accused's right to compulsory process to secure the attendance of a witness does not include the right to compel the witness to waive his Fifth Amendment privilege to refuse to testify on self-incrimination grounds. *See United States v. Moore,* 682 F.2d 853, 856 (9th Cir.1982) (citation omitted). A voluntary guilty plea is a waiver of the Fifth Amendment privilege only in regard to the crime that is admitted; a person entering into a plea agreement retains the right against self-incrimination as to any crimes for which he may still be prosecuted. *See id.* (*citing, inter alia, United States v. Pierce,* 561 F.2d 735, 738 (9th Cir.1977)). Thus, a co-defendant who pleads guilty cannot be forced to testify by another defendant when there is still a genuine possibility that the pleading co-defendant could be prosecuted for other charges. *Moore,* 682 F.2d at 856 (citations omitted).

■■■ Lastly, even if a trial judge erroneously allows a witness to invoke the Fifth Amendment privilege, thereby depriving a defendant of sought-after testimony, a habeas petitioner still must show prejudice from the error; that is, that the error resulted in actual prejudice and had a substantial and injurious effect or influence in determining the jury's verdict. *See United States v. Moore,* 682 F.2d at 857–858. *See also, e.g., Neder v. United States,* 527 U.S. 1, 18, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999) (Fifth Amendment and Sixth Amendment violations analyzed under harmless error standard).

### 3. *Discussion*

■■■ Based on the foregoing authorities, this Court finds at the threshold that there is no Supreme Court holding forbidding a trial judge from accepting a "blanket assertion" of the Fifth Amendment privilege. Contrary' to Petitioner's arguments, while *Hoffman v. United States* does set forth several guidelines for a trial judge's consideration of a witness's claim of the privilege, neither *Hoffman* nor any other Supreme Court case holds that a trial court's grant of the privilege in response to a witness's "blanket assertion" is impermissible. *See Arredondo v. Ortiz,* 365 F.3d at 782 (9th Cir.2004) (*Hoffman* does not forbid blanket invocation of Fifth Amendment privilege). *See also United States v. Moore,* 682 F.2d at 856 (judge may allow exception to Ninth Circuit *Pierce* rule against blanket invocation of privilege where judge has special or extensive knowledge of case); *United States v. Tsui,* 646 F.2d at 367–368 (same); *Davis v. Straub,* 430 F.3d at 287 (Supreme Court has never held that permitting a witness to invoke Fifth Amendment without taking stand violates defendant's right to a fair trial); *United States v. Johnson,* 488 F.2d 1206, 1209, 1211 (1st Cir.1973) ("[i]f it appears that a witness intends to claim the privilege as to essentially all questions, the court may, in its discretion, refuse to allow him to take the stand. Neither side has the right to benefit from any inferences the jury may draw simply from the witness' assertion of the privilege either alone or in conjunction with questions that have been put to him.") (*citing, inter alia, Namet v. United States,* 373 U.S. 179, 186, 189, 83 S.Ct. 1151, 10 L.Ed.2d 278 (1963)). *See*

also *Rucker v. Patrick*, No. 07cv0364–IEG (RBB), 2008 WL 4104230, at *14 (S.D.Cal. 2008) (no Supreme Court decision holding that trial court may not accept blanket assertion of Fifth Amendment privilege, or that privilege may only be invoked on a question-by-question basis) (*citing Vavages*, 151 F.3d at 1191–1192; *Pierce*, 561 F.2d at 741; and *Moore*, 682 F.2d at 856).

Petitioner's arguments that Sheridan had no valid basis for invoking the privilege, and that the trial judge erred by accepting Sheridan's "unexplained" invocation of the privilege, are also unavailing. The prosecutor noted that Sheridan was a felon, and that there were other crimes that Sheridan had been accused of by the defense, including other murders and "framing" other people. (RT 657–658.) In particular, the prosecutor noted that there was potentially an issue of whether Sheridan murdered his stepfather. (RT 659.) The prosecutor's statements were unrebutted at trial, and Petitioner has not shown here, by clear and convincing evidence, that the trial judge was not entitled to rely on those representations.

Petitioner's counsel had originally requested that Sheridan attend a hearing on the issues concerning Sheridan's testimony and immunity. (RT 610.) The trial judge then had Sheridan and his counsel standing by during the hearing on August 17, 200. (RT 610.) The trial judge held Sheridan over until a further hearing in the afternoon in case the judge decided it was necessary to have Sheridan present. (RT 675.) The trial judge then asked the parties if there was "anything else from either side as far as this issue of Mr. Sheridan's testimony and immunity," and defense counsel did not insist on calling Sheridan to the stand for examination of his reasons for taking the Fifth. (*See* RT 676.)

The trial judge also commented that, in his view, Sheridan's "taking the Fifth is *partly* motivated by the fact that the wit-ness does not want to jeopardize the deal the witness has with the prosecution." (RT 671; underline added.) The trial judge stated again his view that "the prosecution is involved with this witness to the degree that this witness taking the Fifth is *partly* the responsibility of the prosecution." (RT 671; emphasis added.) Implicit in these statements is the trial court's judgment that Sheridan's taking of the Fifth was not *completely* motivated by Sheridan's concerns for his plea deal.

 Based on the foregoing, it cannot be said that the trial judge did not adequately inquire into the facts surrounding Sheridan's assertion of the Fifth Amendment privilege. Sheridan's assertion of the privilege must be given liberal construction. *See Hoffman*, 341 U.S. at 486–487, 71 S.Ct. 814. The trial judge may permissibly be governed by his "personal perception of the peculiarities of the case as by the facts actually in evidence." *Id.* The record here reflects that the trial judge was acutely aware of the "peculiarities of the case," and that he discussed those "peculiarities" with the parties in exhaustive detail. Furthermore, as *Hoffman* implies, the judge is not bound merely by "the facts actually in evidence." *Id.* Here, the trial court's decision not to put Sheridan on the stand to personally invoke the privilege was adequately based on the prosecutor's representations and the judge's own obvious grasp of the facts and issues. As such, the judge's acceptance of a so-called "blanket assertion" of the privilege was not contrary to, nor an unreasonable application of, clearly established Federal law.

 The California Court of Appeal also rejected Petitioner's claim that Sheridan waived his Fifth Amendment privilege by accepting the People's plea bargain and agreeing to testify for the prosecution, stating that "[a]s an unconvicted, unsen-

tenced defendant, Sheridan retained his Fifth Amendment rights with respect to the offenses alluded to in the proposed plea agreement." *Woods,* 120 Cal.App.4th at 938–939, 16 Cal.Rptr.3d 174. This denial was not contrary to, nor an unreasonable application of, clearly established Federal law. *See United States v. Paris,* 827 F.2d at 399 (convicted but unsentenced defendant retains his Fifth Amendment rights). Accordingly, the trial judge had no authority to reject Sheridan's Fifth Amendment assertion on the ground that he had waived his right to invoke the privilege by accepting the plea bargain.

■ Furthermore, to the extent that Petitioner argues that the trial court should have limited the scope of Sheridan's testimony in order to obviate the effect of Sheridan's exercise of the Fifth Amendment privilege, or that the trial court should have forced the parties into a stipulation so limiting Sheridan's testimony, such arguments are unavailing. In a case where a defendant seeks to cross-examine a witness, and the witness has invoked the Fifth Amendment, claiming that his testimony might incriminate him on other "collateral" matters, the United States Supreme Court has never made a distinction between allowing cross-examination on "non-collateral" matters, *i.e.,* matters within the scope of direct examination, and barring cross-examination on "collateral" matters. *See Arredondo v. Ortiz,* 365 F.3d at 783 (*citing Williams v. Borg,* 139 F.3d 737, 741 (9th Cir.1998) [rejecting a defendant's attempt to "elevate to a constitutional level the distinction between cross-examination on collateral and non-collateral matters"] ), *cert. denied,* 543 U.S. 892, 125 S.Ct. 102, 160 L.Ed.2d 156 (2004). Likewise, there is no requirement in Supreme Court holdings that a prosecutor must accede to a stipulation limiting cross-examination on such potentially-incriminating "collateral" matters. *Arredondo,* 365 F.3d at 784. Petitioner's citation to First

Circuit cases in support of these arguments is also unavailing, since only the holdings of the Supreme Court warrant relief in this habeas context. *See Duhaime v. Ducharme,* 200 F.3d at 600 (federal habeas court cannot reverse a state court decision based only on circuit precedent); *Robinson v. Ignacio,* 360 F.3d at 1057 (same).

■ Even assuming, *arguendo,* that the trial judge improperly allowed Sheridan to claim the Fifth Amendment privilege, such error was harmless. As analyzed above, Petitioner suffered no prejudice from the exclusion of Sheridan's live testimony, and therefore habeas relief on this ground is not warranted.

### RECOMMENDATION

For all of the foregoing reasons, IT IS RECOMMENDED that the Court issue an Order: (1) approving and adopting this Report and Recommendation; (2) directing that Judgment be entered dismissing instant Petition for Writ of Habeas Corpus with prejudice.

DATED: June 17, 2009